United States Court of Appeals,

Eleventh Circuit.

Nos. 95-2882, 95-3069.

Lawrence ROBBINS, C. Alan Peck, George Levy, Max Bloom, Alfred Edwards, Leonard J. Goldfarb, Milton Stark, Richard Swire, Andrew Mastrangelo, Irving Metzner, Charles Carroll, Thomas Farber, Vincent R. Scala, Betty R. Ramsey, Sidney Field, Mitchell State, Abraham Galfunt, Robert I. Shane, Eva Shane, John A. Brooks, Marian J. Brooks, Leander H. Peterson, Herbert J. Zeiss, Mary Alice Johnson, Howard Perlman, Victor L. Mesaros, R. Bruce Simpson Trust, Plaintiffs-Appellees,

v.

KOGER PROPERTIES, INC., Ira M. Koger, Wallace F.E. Kienast, James B. Holderman, Allen R. Ransom, Defendants,

Sol. H. Proctor, Sandra Proctor, Claimants,

Deloitte & Touche, Defendant-Appellant,

American Institute of Certified Public Accountants, Business and Securities Lawyers, Amicus for Appellant,

National Association of Securities and Commercial Law Attorneys, Amicus.

July 14, 1997.

Appeals from the United States District Court for the Middle District of Florida. (No. 90-896-CIV-J-10), William T. Hodges, Judge.

Before COX, Circuit Judge, HILL, Senior Circuit Judge, and VINING[*], Senior District Judge.

COX, Circuit Judge.

## I. Introduction

Deloitte and Touche challenges the district court's denial of its Fed.R.Civ.P. 50(a) motion for judgment as a matter of law. The district court held that plaintiffs offered sufficient proof of loss causation to support their Rule 10b-5 claim. We reverse and render judgment in favor of Deloitte and Touche.

## II. Facts[1]

---

[*]Honorable Robert L. Vining, Jr., Senior U.S. District Judge for the Northern District of Georgia, sitting by designation.

[1]In reviewing a district court's denial of a motion for judgment as a matter of law, we consider all of the evidence "in the light and with all reasonable inferences most favorable to the party

Deloitte and Touche ("Deloitte"), an accounting firm, conducted audits of the 1988, 1989, and 1990 financial statements of Koger Properties, Inc. ("KPI"), a commercial real estate construction and management company listed on the New York Stock Exchange. KPI included these audited financial statements in its 1989 and 1990 Annual Reports and in its 1989 and 1990 Form 10-K filings with the Securities and Exchange Commission ("SEC"). In both the Annual Reports and the Form 10-K filings, Deloitte represented that, in its opinion, the financial statements presented fairly, in all material respects, the financial position of KPI in accordance with generally accepted accounting principles (GAAP).

The information audited by Deloitte included cash flow figures calculated by KPI for its fiscal years 1988, 1989, and 1990. KPI calculated its cash flow by subtracting from its operating revenues costs related to administration, rental property maintenance, interest, and income tax. KPI generated operating revenue both by leasing properties it developed and by selling such properties.

In the course of its audits, Deloitte noted problems with the accounting methods utilized by KPI to calculate cash flow. Specifically, Deloitte and KPI disagreed at times about whether certain costs should be treated as expenses in a particular year or should be capitalized.[2]

For example, in auditing KPI's fiscal year 1988 statement, Deloitte informed KPI that its capitalization of interest payments was in violation of GAAP. Deloitte initially insisted that KPI record the amount of the discovered overcapitalizations in the fiscal year 1988 financial statement. However, Deloitte ultimately approved KPI's fiscal year 1988 financial statement without a full adjustment for the interest overcapitalization. In addition, throughout the 1989 and 1990 audits, Deloitte repeatedly identified discrepancies between KPI's capitalization of "lease-up" costs and GAAP. Nevertheless, Deloitte approved the financial statements as in accordance with GAAP without requiring a correction. Plaintiffs' expert identified other instances of Deloitte improperly

opposed to the motion." *Boeing Company v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969). Our narrative of the facts, therefore, is constructed in such a fashion.

[2]Capitalizing a cost involves spreading the cost over several years (or "amortizing" the cost), as opposed to treating the cost as an expense in the year in which it is incurred. Thus, capitalizing costs paints a more favorable current financial picture than expensing costs.

approving KPI's capitalization of indirect property costs. In the end, all of these overcapitalizations increased KPI's apparent cash flow.

KPI derived a significant amount of its 1989 and 1990 operating revenue from sales of developed commercial properties to Koger Equity ("KE"). KPI owned a twenty percent interest in KE, and Ira Koger served as chairman and CEO of both KPI and KE. Plaintiffs offered testimony that reporting gains from these sales as operating revenue violated GAAP. In 1991, the SEC required KPI to restate these gains as financing activities, not as operating revenue. These misstated revenues, like the overcapitalizations, increased KPI's apparent cash flow in 1989 and 1990.

During the 1990 audit, Michael Goodbread was a partner at Deloitte with responsibility for the KPI audit. Goodbread owned KPI stock during part of the 1990 audit. This ownership was a violation of generally accepted accounting standards (GAAS). Goodbread did not work at Deloitte during the 1989 audit.

KPI consistently paid nearly all of its cash flow out in the form of quarterly stockholder dividends. Thus, by overstating its cash flow, KPI could pay its shareholders higher dividends. The high dividends were one of the forces behind KPI's stock price. Deloitte, however, never stated that KPI's dividend could continue to be paid. (R.30 at 99.)

According to KPI's 1990 Form 10-K, although the percentage of revenues generated from its leasing operations steadily declined from 1988 through 1990, KPI's quarterly dividend increased throughout this period from $.625 to $.70 per share. Thus, the dividend was increasingly sustained by sales of real estate and was a non-taxable return of capital. Concomitantly, the price of KPI stock steadily declined from 1988 to 1990, from a high of $27.38 in the first quarter of 1988 to $21.13 on June 25, 1990. In the face of a rising dividend, this decrease in stock price meant that KPI's dividend yield rose substantially, from around 10% in July 1989 to over 15% in September 1990. Moreover, this 15% yield was completely non-taxable.

On September 28, 1990, Standard and Poor's downgraded KPI's credit rating, stating that "[t]he company's continued increases in debt and declining equity base are concerns in light of the deteriorating real estate environment." (DX247-C.)

With rumors of a dividend cut swirling, on September 30, 1990, KPI's board of directors decided to cut KPI's future quarterly dividend from seventy cents per share to twenty-five cents per share. The cut took effect after KPI paid a seventy cent dividend it had declared on August 7, 1990. As revealed in the minutes of the board meeting, the board was motivated to reduce its dividend, a form of cash outflow, by a perceived decrease in the availability of future real estate financing. Such financing was necessary if KPI was to continue to sell developed properties and pay the dividend those sales supported. Moreover, the board expressed concern that the current dividend was hard to justify given the recent declines in KPI's stock price.

The dividend cut was announced officially in a press release on October 1, 1990. The press release stated that "[t]here has been no decline in the cash flow of Koger Properties." (DX 253.) Following this announcement, KPI's stock price fell to an average price of $8.20 between October 1 and October 5, down from an average price of $18.25 between September 11 and September 17, a difference of $10.05. It was not until sometime in 1992, according to plaintiffs' expert, that it was discovered that the audited financial statements were false. (R.30 at 48, 83.) Following this discovery, KPI charged an adjustment of over $100,000,000 to its balance sheet. (*Id.*)

### III. Procedural History

Lawrence Robbins filed this action on October 1, 1990, against KPI and several individual defendants seeking certification of a plaintiff class under Fed.R.Civ.P. 23 and damages under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. In January 1991, plaintiff filed an amended complaint adding more named plaintiffs and including Deloitte as an additional defendant. In February 1993, the district court certified a plaintiff class composed of all purchasers of KPI common stock from July 5, 1989, through and including October 1, 1990. KPI and the individual defendants were later dismissed at plaintiffs' request, leaving Deloitte as the sole defendant.

During a nineteen day trial in February and March of 1995, plaintiffs presented their claims to a jury. Plaintiffs claimed that Goodbread's ownership of KPI stock during the 1990 audit impaired Deloitte's ability to act as an independent auditor and that Deloitte, in each of the audits

in question, approved capitalizations and statements of operating revenue that it knew were in violation of GAAP. (R.15-352 at 3-5; R.43 at 182-84.) Plaintiffs claimed that Deloitte misled investors into thinking that KPI's cash flow was sufficient to support its dividend. (R.15-352 at 5.) As a result, members of the plaintiff class suffered damage when they purchased KPI stock during the class period because the price of the stock was "artificially inflated." (R.15-352 at 6; R.2-41 at 11; R.43 at 187.)

As proof of the amount of artificial inflation, plaintiffs offered the testimony of its damages expert. To demonstrate damages, this expert assumed that KPI would have had to cut its dividend at the beginning of the class period had KPI's financial statements been corrected to eliminate the incorrect statements of cash flow. (R.30 at 49-50.) The expert then looked to the decline in the price of KPI stock that occurred after the October 1990 dividend cut—on average $10.05 per share—as a reasonable indicator of the amount that KPI stock would have dropped had the dividend been cut at the beginning of the class period. (R.30 at 49-57.) Therefore, according to this expert, plaintiffs overpaid $10.05 per share for their KPI stock. (R.30 at 49-50.) Plaintiffs did not claim that this October 1990 dividend cut resulted from the discovery of any financial statement errors. (*See generally* R.15-352; R.2-41.) To show that they relied on Deloitte's misrepresentations, plaintiffs utilized the fraud on the market theory which presumes that the plaintiff class relied on an open, well-developed, and efficient market in purchasing KPI stock.

At the close of the evidence, Deloitte moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a), contending that plaintiffs had failed to prove the loss causation element of a Rule 10b-5 claim. The district court denied the motion.

The jury entered a verdict, by way of a special interrogatory verdict form, finding that "Plaintiffs suffered damages as a proximate result of [Deloitte's] material misrepresentation and/or omissions." (R.19-450 at 5.) The jury fixed damages at $10.05 per share and estimated the total damages for the class at $81,338,647.

After denying Deloitte's post-trial motions, the district court entered its judgment and order directing final judgment and retained jurisdiction to supervise the distribution of the award to the

plaintiff class. Deloitte appeals this judgment (appeal 95-2882). At the same time, the district court certified its judgment, the order directing judgment, and the jury verdict for appeal as involving "a controlling question of law as to which there is substantial ground for difference of opinion." 28 U.S.C § 1292(b). We granted Deloitte's § 1292(b) petition (appeal 95-3069).[3]

### IV. Issue on Appeal and Standard of Review

We must decide whether the district court properly denied Deloitte's motion for judgment as a matter of law. Specifically, we must determine whether plaintiffs offered sufficient proof of loss causation to support their Rule 10b-5 fraud claim.[4] We review *de novo* the denial of a motion for judgment as a matter of law. *See Sherrin v. Northwestern Nat. Life Ins. Co.,* 2 F.3d 373, 377 (11th Cir.1993). We therefore utilize the same standard the district court utilized in deciding whether to grant the motion. Under this standard,

> we consider all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party. If the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict, then the motion was properly granted. Conversely, if there is substantial evidence opposed to the motion such that reasonable people, in the exercise of impartial judgment, might reach differing conclusions, then such a motion was due to be denied and the case was properly submitted to the jury.

*Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir.1989) (footnotes omitted). A mere scintilla of evidence is not sufficient to support a jury verdict. *See id.*

### V. Contentions of the Parties

Deloitte contends that the district court should have granted its motion for judgment as a matter of law because plaintiffs did not offer sufficient proof of loss causation as required under Rule 10b-5. Deloitte argues that a 10b-5 plaintiff must show that a defendant's conduct was the actual cause of the decline in value of the plaintiff's investment and that plaintiffs here offered no such proof. Deloitte argues that what might have happened if KPI's cash flow figures had been adjusted during the class period is irrelevant to the issue of loss causation.

---

[3]Given our jurisdiction under § 1292(b), we need not decide whether a judgment that reserves jurisdiction over distribution of an award to a plaintiff class is an appealable final judgment.

[4]Deloitte raises several other issues on this appeal. Our disposition of the loss causation issue obviates the need to discuss these issues.

Plaintiffs contend that they offered sufficient proof of loss causation. Plaintiffs argue that Deloitte's improper approval of KPI's financial statements misled investors about the ability of KPI to maintain its high dividend and thereby artificially inflated KPI's stock price. As evidence of this price inflation, plaintiffs maintain that an adjustment in the stated amount of cash flow in July 1989, the beginning of the class period, would have required KPI to cut or eliminate its dividend, causing a $10.05 decline in KPI's stock price like the decline that occurred in October 1990.

## VI. Discussion

To succeed on a Rule 10b-5 fraud claim, a plaintiff must establish (1) a false statement or omission of material fact (2) made with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's injury. *See Bruschi v. Brown,* 876 F.2d 1526, 1528 (11th Cir.1989). To prove the causation element, a plaintiff must prove both "transaction causation" and "loss causation." *See id.* at 1530. "Transaction causation, another way of describing reliance, is established when the misrepresentations or omissions cause the plaintiff "to engage in the transaction in question.' " *Currie v. Cayman Resources Corp.,* 835 F.2d 780, 785 (11th Cir.1988) (quoting *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 380 (2d Cir.1974)). As such, transaction causation is akin to actual or "but for" causation. Transaction causation is not at issue on this appeal.

Loss causation is at issue. To prove loss causation, a plaintiff must show "that the untruth was in some reasonably direct, or proximate, way responsible for his loss." *Huddleston v. Herman & MacLean,* 640 F.2d 534, 549 (5th Cir. Unit A 1981), *aff'd in part, rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). "If the investment decision is induced by misstatements or omissions that are material and that were relied on by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted." *Id.* (citing *Marbury Management, Inc. v. Kohn,* 629 F.2d 705, 718 (2d Cir.1980)(Meskill, J., dissenting)). In other words, loss causation describes "the link between the defendant's misconduct and the plaintiff's economic loss." *Rousseff v. E.F. Hutton Co., Inc.,* 843 F.2d 1326, 1329 n. 2 (11th Cir.1988).

Because market responses, such as stock downturns, are often the result of many different,

complex, and often unknowable factors, "the plaintiff need not show that the defendant's act was the sole and exclusive cause of the injury he has suffered; "he need only show that it was "substantial,' i.e., a significant contributing cause.' "[5] *Bruschi,* 876 F.2d at 1531 (quoting *Wilson v. Comtech Telecommunications Corp.,* 648 F.2d 88, 92 (2d Cir.1981)). In other words, plaintiff must show that "the misrepresentation touches upon the reasons for the investment's decline in value." *Huddleston,* 640 F.2d at 549. This intermediate approach balances our twin concerns of compensating investors who have suffered loss as a result of a fraudulent misrepresentation, while at the same time preventing 10b-5 from becoming a system of investor insurance that reimburses investors for any decline in the value of their investments. *See id.*

Because Rule 10b-5 provides a remedy for fraud in a wide variety of securities transactions, the loss causation requirement must be applied on a case-by-case basis. In the present case, plaintiffs may have offered sufficient evidence for a reasonable jury to conclude that Deloitte's misrepresentations artificially inflated the price of KPI stock during the class period.[6] This showing of price inflation, however, does not satisfy the loss causation requirement. Our cases do not hold that proof that a plaintiff purchased securities at an artificially inflated price, without more, satisfies

---

[5]The distinction between the loss causation requirement and proof of damages is important. To satisfy the loss causation element, a plaintiff need not show that a misrepresentation was the sole reason for the investment's decline in value. Ultimately, however, a plaintiff will be allowed to recover only damages actually caused by the misrepresentation. 15 U.S.C. § 78bb(a). The proper measure of damages utilizes the out-of-pocket rule: the plaintiff can recover "the difference between the price paid and the "real' value of the security, *i.e.,* the fair market value absent the misrepresentations, at the time of the initial purchase by the defrauded buyer." *Huddleston,* 640 F.2d at 556. Consequently, as long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement. But in determining recoverable damages, these contributing forces must be isolated and removed. This is often done, as it was here, with the help of an expert witness. *See, e.g., Huddleston,* 640 F.2d at 553-554. Proof of damages under the out-of-pocket rule is not proof of loss causation. Our cases have repeatedly treated loss causation and damages as involving discrete inquiries. *See, e.g., Bruschi,* 876 F.2d at 1530-1532; *Huddleston,* 640 F.2d at 549-556.

[6]Plaintiffs made this showing through expert testimony that had these accounting errors come to light at the beginning of the class period, KPI would have been forced to cut its dividend and the stock price would have declined. This showing—which essentially established the value of the investment absent the misrepresentation—was the appropriate proof of damages under the out-of-pocket rule. The attempt to characterize this testimony as proof of loss causation is misplaced. *See supra* note 5.

the loss causation requirement. Some courts have held that "[i]n a fraud-on-the-market case, plaintiffs establish loss causation if they have shown that the price on the date of purchase was inflated because of the misrepresentation." *Knapp v. Ernst & Whinney,* 90 F.3d 1431, 1438 (9th Cir.1996). *See also In Re Control Data Corp. Securities Litigation,* 933 F.2d 616, 619-20 (8th Cir.1991) ("This is a "fraud on the market' case....To the extent that the defendant's misrepresentations artificially altered the price of the stock and defrauded the market, causation is presumed.") But the fraud on the market theory, as articulated by the Supreme Court, is used to support a rebuttable presumption of reliance, not a presumption of causation. *See Basic v. Levinson,* 485 U.S. 224, 241-2, 108 S.Ct. 978, 992, 99 L.Ed.2d 194 (1988) ("Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may by presumed for purposes of a Rule 10b-5 action."). The theory was used for this purpose by the plaintiffs in this case. Because the theory supports a presumption of reliance, it is more closely related to the transaction causation requirement. Our cases have not utilized the theory to alter the loss causation requirement, and we refuse to do so here. Our decisions explicitly require proof of a causal connection between the misrepresentation and the investment's subsequent decline in value. *See, e.g., Huddleston,* 640 F.2d at 549; *Currie,* 835 F.2d at 785; *Bruschi,* 876 F.2d at 1530-1531. *But see* Michael J. Kaufman, *Loss Causation: Exposing a Fraud on Securities Law Jurisprudence,* 24 Ind. L.Rev. 357, 364 (1991) (incorrectly concluding that "[i]n application, the [*Huddleston* ] court allows plaintiffs to recover even when the misrepresentation does not touch upon the reasons for the investment's ultimate decline in value, so long as the misrepresentation creates a disparity between the purchase price and the true value of the securities at the time of the transaction").

Plaintiffs here offered no evidence of a connection between Deloitte's misrepresentations and the decline in price of KPI stock throughout the class period or following the October 1990 dividend cut. In fact, the claims presented to the jury do not attempt to link Deloitte's misrepresentations to any decline in the value of plaintiffs' investment. Instead, plaintiffs simply claim they paid too much. But there is no evidence that this price inflation was removed from the market price of KPI

stock, causing plaintiffs a loss. In 1990, the investing public continued to believe that KPI's 1988, 1989, and 1990 cash flow figures were correct and that KPI would not have to adjust its balance sheet to cover any past errors. Plaintiffs' expert testified that if the market had learned of the overstated cash flow figures while KPI was operating "the stock would have totally collapsed"—that is, any price inflation due to Deloitte's misrepresentations was still present after October 1990 and, therefore, the value plaintiffs lost was not caused by Deloitte's misrepresentations. (R.30-153.) It was not until 1991 that KPI corrected its past operating revenue figures and not until 1992 that KPI charged an adjustment for the previous overcapitalizations.

The minutes of the September 1990 board meeting as well as KPI's financial situation point to the conclusion that KPI cut its dividend in October 1990 because it was concerned that future financing would not be available to sustain its sales of properties—not because it discovered that past accounting errors had overstated its cash flow. No testimony supporting a contrary conclusion was offered. Thus, no evidence supports a conclusion that Deloitte's misrepresentations were a substantial cause of the decline in value of plaintiffs' KPI stock. In short, plaintiffs have proven "the cause of their entering into the transaction in which they lost money but not the cause of the transaction's turning out to be a losing one." *Bastian v. Petren Resources Corp.,* 892 F.2d 680, 684 (7th Cir.1990).

For these reasons, we hold that a reasonable jury could not conclude that Deloitte's misrepresentations were "in some reasonably direct, or proximate, way responsible for [plaintiffs'] loss." *Huddleston,* 640 F.2d at 549. *See also Bennett v. United States Trust Co. of New York,* 770 F.2d 308, 314 (2d Cir.1985) (Plaintiffs "fail to establish the necessary loss causation; there is simply no direct or proximate relationship between the loss and the misrepresentation."). Because plaintiffs failed to support an essential element of their 10b-5 claim, loss causation, the district court erred in denying Deloitte's Fed.R.Civ.P. 50(a) motion for judgment as a matter of law. The district court's judgment is REVERSED, and judgment is RENDERED in favor of defendant.

REVERSED and RENDERED.