**In re COMPUTRON SOFTWARE, INC., Securities Litigation.**

No. Civ.A. 96–1911(AJI).

United States District Court, D. New Jersey.

April 22, 1998.

Daniel L. Berger, Bernstein Litowitz Berger & Grossman LLP, New York City, Jonathan M. Plasse, Goodkind Labaton Rudoff & Sucharow LLP, New York City, Allyn Z. Lite, Goldstein, Lite & DePalma, Newark, NJ, Peter S. Pearlman, Cohn, Lifland, Pearlman, Hermann & Knopf, Saddle Brook, NJ, Miles M. Tepper, West Orange, NJ, Neil L. Selinger, Lowey Dannenberg Bemporad & Selinger, P.C., White Plains, NY, Jerome M. Congress, Milberg Weiss Bershad Hynes & Lerach LLP, New York City, Andrew L. Barroway, Schiffrin Craig & Barroway LLP, Bala Cynwyd, PA, David Jaroslawicz, Jaroslawicz & Jaros, New York City, for Plaintiffs.

Arthur N. Abbey, Abbey Gardy & Squitieri, New York City, Martin Glenn, O'Melveny & Myers, New York City, Brian F. Amery, Bressler, Amery & Ross, Florham Park, NJ, Andrew Bart, Pryor Cashman Sherman & Flynn, New York City, Robert Bartkus, Morristown, NJ, David J. D'Aloia, Saiber Schlesinger Satz & Goldstein, Newark, NJ, Daniel A. Greenstone, Schulte Roth & Zabel, New York City, for Defendants.

## OPINION

LECHNER, District Judge.

On 27 February 1998, counsel for the plaintiff class (the "Plaintiff Class") filed a "Petition of Plaintiffs for Approval of Settlement and the Plan of Distribution and Plaintiffs' Memorandum in Support of that Joint Petition" (the "Joint Settlement Petition") and "Joint Petition of Plaintiffs' Counsel For an Award of Attorneys' Fees and Reimbursement of Expenses and Plaintiffs' Memorandum of Law in Support of that Joint Petition" (the "Joint Petition for Attorneys' Fees") (collectively, the "Joint Motions").[1]

---

1. In support of the Joint Motions counsel for the Plaintiff Class submitted: 'Petition of Plaintiffs for Approval of Settlement and the Plan of Distribution and Plaintiff's Memorandum in Support of that Joint Petition (the "Settlement Brief"); Joint Affidavit of Daniel L. Berger and Jonathan M. Plasse in Support of the Proposed Settlement and Plaintiff's Counsel's Joint Petition for an Award of Attorneys' Fees and Reimbursement of Expenses (the "Joint Aff."); Joint Petition of Plaintiffs' Counsel for an Award of Attorneys' Fees and Reimbursement of Expenses and Plain-

During a hearing on 6 March 1998 (the "6 March 1998 Hearing"), the Joint Motions were granted and an order (the "6 March 1998 Order") was filed. This opinion is intended to supplement the explanation at the 6 March 1998 Hearing for the grant of the 6 March 1998 Order.

*Background*

A. *Generally*

The request for attorneys' fees and costs derived from a $15,000,000.00 settlement (the "Settlement") of a securities class action stemming from the initial public offering (the "IPO") of Computron Software, Inc. ("Computron"). A number of cases arising from the IPO were commenced in April and May 1996 and were consolidated by order, dated 24 June 1996. *See* Joint Aff. at ¶¶ 19–20. The consolidated amended class action complaint (the "Complaint") alleged the defendants Computron, Andreas Typaldos ("A. Typaldos"), Elias Typaldos ("E. Typaldos"), David E. Gerth ("Gerth"), Gennaro Vendome ("Vendome"), Frederick Zenna ("Zenna"), Gregory Kopchinsky ("Kopchinsky") and Robert J. Migliorino ("Migliorino")[2] had falsely portrayed the financial condition of Computron.[3] The Complaint alleged these false portrayals were made in order to complete the IPO and allow certain of the Individual Defendants to profit by selling millions of dollars of Computron stock. *See id.* at ¶¶ 10–15.

The IPO was completed on 24 August 1995 at $17.50 per share based primarily upon the 1994 financial statements of Computron (the "1994 Financials"). *See* Joint Aff. at ¶¶ 11–12. The 1994 Financials reported the first net profit in the history of Computron. *See id.* ¶¶ 12–13.

On 21 February 1996, Computron unexpectedly announced its fourth quarter and year end 1995 results were being delayed indefinitely (the "21 February 1996 Announcement"). *See* Joint Aff. at ¶ 15. On 1 April 1996, Computron announced it had incurred a substantial loss for the fourth quarter and year ended 31 December 1995 (the "1 April 1996 Announcement"). *See id.* at ¶ 16. Discovery was stayed pending resolution of a motion to dismiss submitted by the Defendants in October 1996. *See* Joint Aff. at ¶¶ 20, 22. On 27 January 1997, while the motion to dismiss was *sub judice*, Computron announced Arthur Andersen was withdrawing its reports on the previously issued financial statements for Computron (the "27 January 1997 Announcement"). *See id.* at ¶ 17.

On 17 April, 1997, Computron restated its financial statement for the years ended 31 December 1992, 1993, 1994 and 1995, and all interim periods subsequent to the IPO. *See* Joint Aff. at ¶ 18. As a result, the motion to dismiss was deemed withdrawn and the Plaintiff Class amended its complaint to add the newly discovered information. *See id.* at ¶¶ 24–25. Thereafter, on 30 May 1997, the Plaintiff Class filed the fourth consolidated amended complaint, which the Defendants answered.

The Defendants agreed to stipulate to a class and, on 27 June 1997, it was determined

---

tiffs' Memorandum of Law in Support of that Joint Petition; Affidavits of Plaintiffs' Counsel Daniel L. Berger (the "Berger Aff."), Jonathan M. Plasse (the "Plasse Aff."), Peter S. Pearlman (the "Pearlman Aff."), Joseph J. DePalma (the "DePalma Aff."), David Jaroslawicz (the "Jaroslawicz Aff."), Neil L. Selinger (the "Selinger Aff."), Jerome M. Congress (the "Congress Aff."), Andrew L. Barroway (the "Barroway Aff.") and Miles M. Tepper (the "Tepper Aff."); Affidavits of Experts Robert Berliner and John B. Torkelsen.

2. A. Typaldos, E. Typaldos, Gerth, Vendome, Zenna, Kopchinsky and Migliorino will be referred to as the "Individual Defendants."

3. Although not defendants in the instant action, Arthur Andersen LLP ("Arthur Anderson"), Computron's independent auditor, American Alliance

Insurance Company, Zurich Insurance Company, Evanston Insurance Company, Lexington Insurance Company and Admiral Insurance Company (collectively, the "Insurance Carriers"), and Donaldson Lufkin & Jenrette, Cowen & Company and First Albany Corporation (collectively, the "Underwriters") are parties to the Settlement. *See* Joint Aff. at ¶ 4.

The Plaintiff Class represented that it not only developed a case against the Defendants, but against Arthur Andersen as well. *See* Settlement Brief at 5. As a result of a review of the audit workpapers of Arthur Andersen, the Plaintiff Class also intended to file a complaint against Arthur Andersen. *See id.*

For the period of time at issue, the Insurance Carriers provided liability coverage to Computron. *See* Joint Aff. at ¶ 4.

the instant action could proceed as a class action on behalf of a class consisting of all persons and entities who purchased Computron stock between 24 August 1995 and 27 January 1997. The Plaintiff Class excluded the Defendants, the officers and directors of Computron, members of their immediate families and their legal representatives, heirs, successors or assigns, any entity in which any Defendant has or had a controlling interest and the Underwriters. *See* Joint Aff. at ¶¶ 27–28.

Since April 1996, counsel for the Plaintiff Class have diligently investigated and vigorously pursued claims asserted on behalf of the Plaintiff Class.

*Discussion*

### A. Joint Settlement Petition

#### 1. Settlement Negotiations

In July 1997, the Defendants approached the Plaintiff Class about the possibility of settling the instant action. *See* Settlement Brief at 5. Thereafter, during a three-month period, Co–Lead Counsel[4] for the Plaintiff Class engaged in four, arm's-length settlement meetings with counsel for the Defendants. *See* Joint Aff. at ¶¶ 37–38, 52. These meetings involved in-depth discussions concerning key liability and damage issues underlying the claims of the Plaintiff Class and the defenses asserted with respect to those claims. *See id.* at ¶ 39.

Specifically, counsel debated (1) whether the Plaintiff Class could assert claims under Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k ("Section 11") on behalf of persons who purchased stock after the IPO, (2) whether the Plaintiff Class would be able to prove loss causation with respect to approximately ninety-five percent of its damages, and (3) the maximum amount of damages the Plaintiff Class would be able to recover if it prevailed at trial. *See* Joint Aff. at ¶¶ 15, 18. Arthur Andersen participated in certain of these negotiation sessions in an effort to resolve the claims the Plaintiff Class intended to assert. *See* Settlement Brief at 5.

Counsel continued their efforts to achieve a satisfactory resolution of the instant action with the assistance of Magistrate Judge Dennis M. Cavanaugh. After two full-day mediation sessions before Magistrate Judge Cavanaugh on 20 October 1997 and 24 October 1997, the Plaintiff Class agreed to settle its claims against Defendants and Arthur Andersen for total consideration of $15,000,-000.00. *See* Joint Aff. at ¶ 52.

#### 2. Terms of the Settlement

The Settlement consists of (1) payment by Computron of $1,000,000.00 in cash, (2) payment by the Insurance Carriers of $1,850,-000.00 in cash, (3) payment by certain of the Individual Defendants, namely A. Typaldos, E. Typaldos and Vendome of $3,650,000.00 in cash, (4) payment by Arthur Andersen of $3,500,000.00 in cash, and (5) an additional $5,000,000.00 to be contributed by Computron in either cash, or at the option of Computron, newly issued common stock of Computron (the "Settlement Stock") (collectively the "Settlement Fund"). *See* Settlement Brief at 6.

If Computron chooses to issue Settlement Stock instead of cash, the Plaintiff Class members will be protected against any decline in the value of the Settlement Stock. *See* Settlement Brief at 6. Each share of Settlement Stock distributed will be paired with a non-transferable right to resell the Settlement Stock at the value at which it was received to a trust Computron will fund with $5,000,000.00 in cash.[5] *See id.* Plaintiff Class members do not have to sell the Settlement Stock to the trust. *See id.* Members of the Plaintiff Class will have the opportunity to sell their shares into the market place as soon as they are received, or they may retain the shares in order to participate in

---

4. Co–Lead Counsel refers to Daniel L. Berger, Esq. and Lisa K. Buckser, Esq. of Bernstein Litowitz Berger & Grossmann LLP and Jonathan M. Plasse, Esq. and Catherine A. Murphy, Esq. of Goodkind Labaton Rudoff & Sucharow LLP.

5. This aspect of the Settlement was further explained during the 6 March 1998 Hearing.

Counsel indicated members of the Plaintiff Class will be afforded a twenty-day trading period in December 1998 where they "will be able to exercise their put right and get $5.[00] in cash" from the trust for each share of Settlement Stock they own. *See* Transcript from 6 March 1998 Hearing at 15.

any price appreciation that may occur in Settlement stock over time. *See* Joint Aff. at ¶¶ 6–7.

At the 6 March 1998 Hearing, counsel for the Plaintiff Class indicated Computron had elected to contribute $5,000,000.00 in Settlement Stock at $5.00 a share. *See* Transcript form 6 March 1998 Hearing at 14.

The plan of distribution (the "Plan of Distribution") of the proceeds from the Settlement Fund provides that each member of the Plaintiff Class will receive a pro rata share of his or her "defined loss." *See* Settlement Brief at 6. The defined loss is based upon the inflation per share in the price of Computron common stock during three distinct time periods. *See id.* The first period (the "First Period") is from 24 August 1995 through 20 February 1996.[6] *See id.* at 6–7. The second period (the "Second Period") is from 21 February 1996 through 1 April 1996.[7] *See id.* at 7. The third period (the "Third Period") is from 2 April 1996 through 27 January 1997.[8] *See id.*

### 3. *The Law*

Settlements of disputed claims, especially of complex class action litigations, are favored by the courts. *See In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir.) (*"GM Trucks"*) ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."), *cert. denied*, 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995); *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1314 n. 16 (3d Cir.1993) ("Where a settlement is reached on terms agreeable to all parties, it is to be encouraged.").

■ In reviewing a proposed settlement, a district court should determine whether a settlement is "fair, reasonable and adequate." *GM Trucks*, 55 F.3d at 785 (citations omit-

ted). Factors relevant to this determination include:

> (1) the complexity and duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of litigation.

*See GM Trucks*, 55 F.3d at 785 (citing *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.1975)).

#### a. *Complexity and Duration*

■ The claims of the Plaintiff Class involved numerous complex legal issues and technical accounting issues. In addition, complex damage issues. All of these issues required extensive expert testimony which would have added to the expense and duration of the instant litigation. However, the able efforts of Magistrate Judge Cavanaugh and counsel resulted in the instant matter settling before fact and expert depositions were taken and before pre-trial preparation commenced. There is no question that continued litigation would have substantially increased the expense and the duration of the instant action.

Also, even if the Plaintiff Class were to recover a larger judgment at trial, which is not guaranteed, the additional delay caused by a trial, post-trial motions and the appellate process, would delay recovery to the Plaintiff Class for years. Avoiding this unnecessary and unwarranted expenditure of resources and time benefitted all parties. *See GM Trucks*, 55 F.3d at 812; *see also Hoffman Elec., Inc. v. Emerson Elec., Co.*, 800 F.Supp. 1279, 1285 (W.D.Pa.1992) ("Here, the trial, as ... all securities fraud trials, will be long and complex.... Thus,

---

6. The First Period commences the day of the IPO and continues through the day preceding the 21 February 1996 Announcement. *See* Settlement Brief at 7.

7. The Second Period commences the day of the 21 February 1996 Announcement through the

day of the 1 April 1996 Announcement. *See* Settlement Brief at 7.

8. The Third Period commences the day after the 21 April 1996 Announcement and continues through the day of the 27 January 1997 Announcement. *See* Settlement Brief at 7.

the complexity, expense and duration of the litigation weigh in favor of settlement."). As the Plaintiff Class correctly argues "[t]he Settlement secures for the [Plaintiff] Class a substantial benefit undiminished by further litigation expenses, without the delay, risk and uncertainty of continued litigation." Settlement Brief at 11–12.

### b. *Reaction of the Plaintiff Class to the Settlement*

The strong support of the members of the Plaintiff Class also favors approval of the Settlement. Copies of the Notice of. Settlement were mailed to more than 10,000 members of the Plaintiff Class; not one objection was received to the proposed Settlement. *See* Joint Aff. at ¶¶ 8–9; 6 March 1998 Hearing at 4. The complete lack of objection from members of the Plaintiff Class, which included sophisticated institutional investors, substantially evidences the Settlement is fair, adequate and in the best interests of the Plaintiff Class. *See Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118–19 (3d Cir.1990) (observing the objections of "only" 29 members of the class comprised of 281 "strongly favors settlement"); *see also In re Smith-Kline Beckman Corp. Sec. Litig.*, 751 F.Supp. 525, 530 (E.D.Pa.1990); *Fisher Bros., Inc. v. Mueller Brass Co.*, 630 F.Supp. 493, 498 (E.D.Pa.1985).

### c. *Stage of the Proceedings*

Since the initiation of the instant matter in April 1996, counsel for the Plaintiff Class has conducted a thorough and efficient investigation and analysis of the claims of the members of the Plaintiff Class. A private investigator was retained to identify and interview fact witnesses. *See* Settlement Brief at 12. Counsel for the Plaintiff Class also interviewed former employees of Computron. *See id.* At the time the Settlement was reached, document discovery was nearly complete and depositions were about to begin. *See* Joint Aff. at ¶ 36.

Settlements reached at earlier stages of proceedings, as in the instant case, are favored. *See, e.g., Weiss v. Mercedes–Benz of North Am., Inc.*, 899 F.Supp. 1297, 1301 (D.N.J.1995), *aff'd,* 66 F.3d 314 (3d Cir.1995) (settlement approved while the "case is still in the early stages of discovery"); *see also In re Novacare Sec. Litig.*, [1995–1996 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,930 at 93,500 (E.D.Pa. 13 Oct. 1995) ("[O]ne of the benefits of settlement at an early stage is avoidance of the expense of extended discovery that might well effect [sic] plaintiffs' proof at trial. When the parties reach an early settlement, it must be fair, adequate, and reasonable but not necessarily identical with the results that might be reached at trial.").

### d. *Risks of Establishing Liability*

The Plaintiff Class contended while it believed there was substantial evidence to support its claims, the complexities and uncertainties of the instant litigation warranted approval of the Settlement. *See id.*

The parties disputed the ability of the Plaintiff Class to establish loss causation which is an element of the asserted claims. *See* Settlement Brief at 14–16. Notwithstanding the confidence of counsel for the Plaintiff Class that loss causation could be proved, the outcome of the instant dispute was not certain. The Plaintiff Class relied upon *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441 (11th Cir.1997), a case the Plaintiff Class argued is distinguishable from the instant matter, but illustrative of the potential of no recovery if the case proceeded to trial. *See* Settlement Brief at 16.

In *Koger*, shareholders brought a class action against an accounting firm because of its certification of financial statements that were prepared in violation of generally accepted accounting principles. *See* 116 F.3d at 1445. At the close of the presentation of evidence, the defendant moved, pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, for a judgment as a matter of law. *See id.* at 1446. The district court denied this motion. *See id.*

The jury return a verdict for the plaintiffs. *See Koger*, 116 F.3d at 1446. The Eleventh Circuit reversed the denial of the Rule 50(a) motion, and held that the losses alleged by the plaintiffs were not due to the alleged fraud, but were the result of a decline in the price for Koger stock that occurred when Koger cut its dividend, two years before the falsity of the previously issued financial

statements was disclosed. *See id.* at 1448–1449.

Also, disagreement existed as to whether the Plaintiff Class would be able to recover on its Section 11 claims. *See* Settlement Brief at 16. The Defendants relied upon *Gustafson v. Alloyd Co.*, 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), and its progeny, in support of their argument that only those who purchased Computron stock in the IPO could maintain claims under Section 11. *See* Settlement Brief at 16. The Defendants argued it was likely most of the individuals who purchased Computron stock during the IPO sold their shares long before the disclosure of any problems at Computron and, therefore, suffered no loss. *See id.*

The Plaintiff Class argued *Gustafson* dealt with claims asserted pursuant to Section 12(a)(2) of Securities Act of 1933, 15 U.S .C. § 77l(a)(2), and not with Section 11 claims. *See* Settlement Brief at 17. The Plaintiff Class, however, also noted the argument of the Defendants had found support in several district court decisions where the reasoning of *Gustafson* is extended to Section 11 claims. *See id.* The Plaintiff Class conceded the possibility that its Section 11 claim was not viable diminished its likelihood of recovery. *See id.*

The possibly of losing the Section 11 claims, required the Plaintiff Class to proceed under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("Section 10(b)") which necessitates a showing of scienter. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 383, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 274 (3d Cir.1998); *Kline v. First Western Government Sec., Inc.*, 24 F.3d 480, 493 (3d Cir.), *cert. denied sub nom* 513 U.S. 1032, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994); *see also* Settlement Brief at 17. The Plaintiff Class argued it could have established some of the Defendants possessed actual knowledge of the alleged fraud, but it would have been difficult to make such a showing as to the Individual Defendants, none of whom sold stock in the IPO. *See id.* Also, the Plaintiff Class contended if it proved the Defendants had knowledge of the fraud, such proof would have undercut the ability of the Plaintiff Class to recover damages because proof of fraud would have likely eliminated the liability insurance policies of the officers as a source of recovery. *See id.* at 18.

Additionally, the Plaintiffs argued the Settlement was reasonable because it would have been difficult to prove a Section 10(b) claim against Arthur Andersen in light of the decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). *See* Settlement Brief at 18. *Central Bank of Denver* eliminated aiding and abetting liability in private actions for violations of Section 10(b). *See* 511 U.S. at 191, 114 S.Ct. 1439. Thus, in the instant action, the Plaintiff Class would have had to demonstrate Arthur Andersen acted with actual knowledge or reckless disregard of the fact that its unqualified, independent reports of its auditor and opinions relating to the financial statements for Computron for the fiscal years ended 31 December 1992, 1993 and 1994 were false and misleading. *See* Settlement Brief at 18. In light of the possibility that Arthur Andersen was intentionally mislead by Computron during its audits, the Plaintiff Class might not have been able to establish liability under Section 10(b) against Arthur Andersen. *See Newton*, 135 F.3d at 274; *Kline*, 24 F.3d at 493.

e. *Risks of Establishing Damages*

The Plaintiff Class contended even if it was able to overcome the aforementioned obstacles in substantiating liability, there were substantial risks in establishing damages. *See* Settlement Brief at 18. The Plaintiff Class argued these risks have been avoided by the Settlement. *See id.*

In a Section 10(b) action, the damages are measured by the "out of pocket" expenses incurred.

> Under this measure, a defrauded buyer may recover "the difference between the purchase price and the value of the stock [i.e., value absent the fraud] at the date of purchase." Because fair value presumably will differ from the stock market price (the latter being inflated by the fraud), expert testimony is almost always necessary to

establish the amount—and indeed the existence—of actual damages.

Settlement Brief at 19 (quoting *In re Greenwich Pharmaceutical Sec. Litig.,* [1995 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98, 744 at 92, 521 (E.D.Pa. 26 Apr. 1995) (citation omitted)). Typically, the "fair value" of a stock is estimated by examining the market price following dissemination of the fraudulently withheld material. *See Harris v. Union Elec. Co.,* 787 F.2d 355, 367 (8th Cir.), *cert. denied,* 479 U.S. 823, 107 S.Ct. 94, 93 L.Ed.2d 45 (1986); *Harris v. American Inv. Co.,* 523 F.2d 220, 226–27 (8th Cir.1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976); *Schultz v. Commercial Programming Unlimited Inc.,* 91 civ. 7924, 1992 WL 396434, at * 5 (S.D.N.Y. Dec. 23, 1992).

The Plaintiff Class conceded the piecemeal disclosures offered by Computron posed an obstacle for the Plaintiff Class to prove damages using the above analysis. *See* Settlement Brief at 19. One of the primary aspects of the Settlement discussions focused on the fact that Computron stock lost much of its value following the 21 February and 1 April 1996 Announcements. *See id.* The damage expert for the Plaintiff Class treated the 21 February and 1 April 1996 Announcements as partial disclosures of the fraud and included the corresponding price declines in the damage analysis to arrive at maximum recoverable damages of $33,700,000.00. *See id.*

The Plaintiff Class acknowledged the Defendants argued the actual disclosure of the misstatements in the previously issued financial statements of Computron was not made until 27 January 1997. *See* Settlement Brief at 19–20. The Defendants contended the Plaintiff Class could not recover for any decline in Computron stock before the 27 January 1997 Announcement. *See id.* at 20. Additionally, the Defendants argued even if the Plaintiff Class was able to prove loss causation with respect to the 21 February and 1 April 1996 Announcements, a substantial part of the decline in the price of Computron stock was the result of a decline in the business of Computron. *See id.* The expert for the Defendants estimated the damages

sustained by the Plaintiff Class to amount to $10,800,000.00 to $15,800,000.00. *See id.*

The Plaintiff Class argued it was satisfied it could provide convincing expert testimony as to damages and receive a favorable judgment, but also realized "it is certainly not inconceivable that, in the unavoidable 'battle of experts,' a jury might disagree with [the Plaintiff Class]." *See* Settlement Brief at 20 (citing *United States v. 412.93 Acres of Land,* 455 F.2d 1242, 1247 (3d Cir.1972) ("The jury . . . is under no obligation to accept as completely true the testimony of any expert witness. It may adopt as much of the testimony as appears sound, reject all of it, or adopt all of it."); *In re Greenwich Pharmaceutical Sec. Litig.,* [1995 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,744 at 92,522 ("Given these divergent [damage] theories [of plaintiffs and defendants], it is impossible to predict how the jury would react. . . . This unpredictability is avoided by the proposed settlement, which provides the class with a meaningful percentage of the recovery that might realistically be obtained through trial.")).

### f. *Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery*

The Settlement represents at least forty-five percent of the maximum damages recoverable by the Plaintiff Class and almost one hundred percent of the damages the Plaintiff Class would have recovered if a jury accepted the damage analysis proffered by the Defendants. *See* Settlement Brief at 21.

Also, if litigation had proceeded, Computron may have been forced into Bankruptcy. *See* Settlement Brief at 21. This possibility, in addition to the expenses involved with legal defense fees, presented the risk that the Plaintiff Class could have won a favorable judgment against a judgment-proof entity without insurance. *See* Joint Aff. at ¶¶ 38, 47.

An analysis of the above factors overwhelmingly established the Settlement was "fair, reasonable and adequate." Magistrate Judge Cavanaugh, counsel for the Plaintiff Class and counsel for the Defendants are commended for their quick and efficient resolution of the instant matter. The profession-

alism of counsel for all parties played a part in the efficient and reasonable resolution of the instant matter.

### 3. The Plan of Distribution of the Settlement Fund is Fair and Reasonable

Approval of a plan of allocation of a settlement fund in a class action is "governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate." *In re Oracle Sec. Litig.*, [1994–1995 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,355 at 90,446 (N.D.Cal. 18 Jun. 1994); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1284–85 (9th Cir.), *cert. denied sub nom* 506 U.S. 953, 113 S.Ct. 408, 121 L.Ed.2d 333 (1992). "A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable." *In re Oracle Sec. Litig.*, [1994–1995 Transfer Binder] Fed.Sec.L.Rep. (CCH) at 90, 446.

The Plan of Distribution treats all members of the Plaintiff Class in an identical matter. *See* Settlement Brief at 22. All members of the Plaintiff Class receive a pro rata share of their defined loss. *See id.* The only distinction made by the Plan of Distribution is that the amount of losses suffered by members of the Plaintiff Class differs depending upon when a member made his or her purchase of Computron stock. *See id.* Members of the Plaintiff Class who purchased shares of Computron stock during the First Period suffered the greatest damages because the market was not aware of any problems experienced by Computron. *See id.* Members of the Plaintiff Class who made their purchases during the Second Period experienced lower damages because a great deal of the inflation in the price of Computron stock was removed by the 21 February 1996 Announcement. *See id.* at 22–23. Members of the Plaintiff Class who purchased shares during the Third Period have the smallest amount of damages because the market price of Computron stock after the beginning of the Third Period reflected the fact that Computron was failing financially. *See id.* at 23. Accordingly, the Settlement and Plan of Distribution are "fair, reasonable and adequate."

### B. Joint Petition for Attorneys' Fees

■ Attorneys who represent a class and aid in the creation of a settlement fund are entitled to compensation for legal services offered to the settlement fund under the common fund doctrine. *GM Trucks*, 55 F.3d at 820 n. 39. A district court must thoroughly analyze a fee application in a class action settlement. *See id.* at 819. This rule holds even where the parties to the class action have consented to an award of attorneys' fees because there exists the "danger ... that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment for fees." *Id.* (quoting *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir. 1991)). The possible self-interest of a defendant who is paying both the settlement amount and attorneys' fees often does not protect against this danger because " 'a defendant is interested only in disposing of the total claim asserted against it; ... the allocation between the class payment and the attorneys' fees is of little or no interest to the defense.' " *Id.* at 819–20 (quoting *Prandini v. National Tea Co.*, 557 F.2d 1015, 1020 (3d Cir.1977)); *Strong v. BellSouth Telecomm., Inc.*, 137 F.3d 844, 849–50 (5th Cir.1998). Therefore, the Circuit has cautioned that a "district court must be alert to the presence in the fee agreement of any actual abuse or appearance of abuse capable of creating a public misunderstanding." *GM Trucks*, 55 F.3d at 920.

### 1. Entitlement to Benefits

■ "The amount of the award of attorneys' fees and expenses is controlled by the Court and is within its sound discretion." *GM Trucks*, 55 F.3d at 783, 821 (citing *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 115 (3d Cir.1976)). Determining an appropriate award is not an exact science. The facts of each individual case drive the amount of any award.

### 2. Method for Determining the Fee Award

Caselaw establishes two methods for evaluating the reasonableness of a request for

attorneys' fees—the lodestar approach and the percentage-of-recovery approach. Each is especially suited for a particular type of case. *See GM Trucks*, 55 F.3d at 821 (citation omitted). When deciding upon a fee award, a court must first categorize the type of action before it and then primarily rely upon the corresponding method of awarding fees. *See id.* Either the percentage-of-recovery method or the lodestar method should ordinarily serve as the primary basis for determining the fee award; however, the Circuit has instructed that a "court may . . ., as a check, want to use the lodestar method to assure that the precise percentage awarded does not create an unreasonable hourly fee." *Id.* at 822.

■ The lodestar method, which calculates fees by multiplying the number of hours by some hourly rate determined to be suitable for the region and experience of the lawyer, is the appropriate method in statutory fee-shifting cases. *See GM Trucks*, 55 F.3d 821.

■ Conversely, the percentage-of-recovery method is used in common fund cases on the theory that the members of the class would be unjustly enriched if they did not adequately compensate counsel responsible for generating the fund. *See GM Trucks*, 55 F.3d at 821 (citation omitted). Typically, a court should apportion the fund between the class and its counsel in a way "that rewards counsel for success and penalizes it for failure." *Id.* This method is similar to a contingency arrangement in that it awards counsel a variable percentage of the amount ultimately recovered for the class. *See id.* at 819 & n. 38.

"Common fund" principles and the inherent management powers of the court have been utilized to award fees to lead counsel in cases that do not actually generate a common fund. *See GM Trucks*, 55 F.3d at 821. While the Circuit has expressed a preference for the percentage-of-recovery method in common fund cases, *see id.* at 821–22, neither the Circuit nor the United States Supreme Court has held that utilization of the percentage-of-recovery method is exclusive or mandated in such cases. *See id.* at 821 ("The ultimate choice of methodology will rest within the district court's sound discretion.").

Here, as in *GM Trucks*, the attorneys' fees sought are more closely aligned to the common fund model than the statutory fee paradigm. In assessing the requested fee in the instant matter, the percentage-of-recovery method was primarily relied upon, but the lodestar method served as a useful cross-check.

### 3. *Application of Percentage-of-Recovery Method*

#### a. *General*

Under the percentage-of-recovery method, a court must (1) value the proposed settlement and (2) decide what percentage of the proposed settlement should be awarded as attorneys' fees. *GM Trucks*, 55 F.3d at 822. The Circuit has observed that in valuing a settlement offer a district court must "determine a precise valuation of the settlement on which to base its award." *Id.* Despite the obvious rigor of engaging in this process, the Circuit also observed that "[a]t the very least, the district court . . . needs to make some reasonable assessment of the settlement's value." *Id.; see also Weiss*, 899 F.Supp. at 1304.

A court also must specify the percentage it has utilized in determining the fee award. *See GM Trucks*, 55 F.3d at 822 ("At the very least, the district court . . . needs to make some reasonable assessment of the settlement's value and determine the precise percentage represented by the attorneys' fee."). There is no set standard, however, on how to determine a reasonable percentage. Awards utilizing the percentage-of-recovery method can reasonably range from nineteen percent to forty-five percent of a settlement fund.

A variety of factors guide the instant determination. For example, a court can consider what percentage the litigants might have negotiated as part of a private contingent fee arrangement. *See Matter of Continental Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir.1992) ("The object in awarding a reasonable attorney's fee . . . is to simulate the market. . . . The class counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee

basis, with a similar outcome, for a paying client.").

■ Fee awards generally, and should, decrease as the amount of recovery increases in order to avoid fee awards inconsistent with the exerted efforts of counsel. As well, the percentage awarded, should, and generally does, increase commensurate with increased quality of representation. The quality of representation can be rewarded by considering the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel. These factors are not exclusive; the propriety of the requested fee award is fact intensive.

■ Counsel for the Plaintiff Class requested twenty-five percent of the Settlement Fund in counsel fees. It was determined twenty-five percent of the amount remaining after unreimbursed expenses were deducted from the Settlement Fund is fair, considering the diligent efforts of counsel leading to the quick and reasonable resolution of the instant matter.[9] *See* Transcript from 6 March 1998 Hearing at 8–10. This percentage is well within the percentages awarded in other cases and rewards experienced counsel for representing the Plaintiff Class in a thorough, competent and professional manner.

As indicated, the lodestar method can be used to cross check an award under the percentage-of-recovery method. *See GM Trucks*, 55 F.3d at 820–21 & n. 40. In the instant case, a fee award using the percent-age-recovery method at twenty-five percent resulted in a fee award of approximately 2.5 times the lodestar amount. Such a premium is fair, considering the professional efforts extended and the fair and adequate Settlement reached by counsel. Moreover, during the 6 March 1998 Hearing, not one objection was noted from any of the members of the Plaintiff Class as to the award of attorneys' fees. *See* Transcript from 6 March 1998 Hearing at 4, 7.

Both the Plaintiff Class and counsel must be protected in determining appropriate counsel fees. Counsel should receive appropriate compensation for the extraordinary efforts extended in generating the Settlement Fund from which members of the Plaintiff Class will benefit. If adequate compensation is not awarded to counsel, the Plaintiff Class would be inappropriately enriched.

In approving the Settlement during the 6 March 1998 Hearing, the complexity of the issues, the significant attendant risks of proceeding with the instant litigation, and the tenacity, vigor and professionalism with which all attorneys represented the interests of their clients were acknowledged. The ability of counsel for all parties, with the diligent, effective efforts of Magistrate Judge Cavanaugh,[10] to arrive at such an expeditious, reasonable, fair and adequate Settlement further supports the award of attorneys' fees in the instant action.

*Expenses*

Counsel for the Plaintiff Class also requested reimbursement for expenses and costs in the amount of $350,000.00.[11] This

---

9. During the 6 March 1998 Hearing, counsel for the Plaintiff Class indicated they will participate in both the cash and Settlement Stock aspects of the Settlement. *See* Transcript from 6 March 1998 Hearing at 14. Accordingly, counsel for the Plaintiff Class are to receive their compensation on the same payment terms as the Plaintiff Class. *See id.*

10. At the 6 March 1998 Hearing, Martin Glenn, counsel for defendants Computron, Gerth, Zenna, Migliorino and Kopchinsky stated:

Your Honor, for the record, I wanted to express our appreciation to the efforts of the Court and in particular for the efforts of [Magistrate] Judge Cavanaugh, who really worked extremely diligently and effectively in bringing both sides together in the settlement . . . approved today.
Transcript from 6 March 1998 Hearing at 18.

11. Supporting documentation submitted by Counsel for the Plaintiff Class requested an award of unreimbursed expenses in the amount of $282,315.46. *See* Joint Aff. at ¶ 59. At the 6 March 1998 Hearing, however, counsel for the Plaintiff Class indicated they had failed to include an unpaid invoice from a damage expert, Princeton Venture Research, of $81,000.00 in this calculation. *See* Transcript from 6 March 1998 Hearing at 6. Although increasing the amount of unreimbursed expenses to $364,-

figure was uncontested. Further, the attorneys for the Plaintiff Class submitted extensive documentation outlining and supporting this request. *See* Joint Aff.; Berger Aff.; Plasse Aff., Pearlman Aff., DePalma Aff.; Jaroslawicz Aff.; Selinger Aff.; Congress Aff.; Barroway Aff.; Tepper Aff. The complex nature of this class action and the efforts exerted by all attorneys involved, and the necessity for outlaying the expenses involved in the instant suit, further support the request for attorneys' fees was reasonable. An award of $350,000.00 in costs and expenses to counsel for the Plaintiff Class was, therefore, approved.

*Conclusion*

For the foregoing reasons, the Joint Settlement Petition and the Joint Petition for Attorneys' Fees were granted. An award of twenty-five percent of the Settlement Fund net of unreimbursed expenses in counsel fees was appropriate. Additionally, the reimbursement of costs and expenses in the amount of $350,000.00 was appropriate as well.

312.25, counsel for the Plaintiff Class indicated they were only requesting $350,000.00. *See id.* at 7. Counsel also indicated the notice sent to the members of the Plaintiff Class informed the members counsel would be applying to the court for expenses of no more than $350,000.00. *See* *id.* Counsel stated they would absorb any unreimbursed expense in excess of the $350,000.00. *See id.* Counsel for the Defendants did not object to such an award, *see id* . at 7–8, which, as indicated, was in the amount included in the notice sent to the Plaintiff Class.