**ERIE COUNTY RETIREES ASSOCIATION and Lyman H. Cohen, for himself and all others similarly situated, Plaintiffs,**

v.

**The COUNTY OF ERIE, PENNSYLVANIA and Erie County Employees' Retirement Board, Defendants.**

**Civil Action No. 98–272 Erie.**

United States District Court, W.D. Pennsylvania.

March 20, 2002.

---

Richard A. Lanzillo, Mark J. Kuhar, Knox, McLaughlin, Gornall & Sennett, Erie, PA, for plaintiffs.

John E. Cooper, Erie, PA, for defendants.

# MEMORANDUM OPINION

McLAUGHLIN, District Judge.

Plaintiffs have filed a Stipulation for Settlement of Class Action ("Settlement") [Doc. No. 95] and an Application for Approval of Attorneys' Fees [Doc No. 99]. Previously, they commenced this class action alleging that their former employer, the County of Erie, discriminated against them in violation of the Age Discrimination in Employment Act ("ADEA") when it required them to accept health care coverage under an HMO plan while offering younger retirees health care coverage under a traditional indemnity plan.[1] The Plaintiff class is comprised of retirees of the County who are ages 65 and older, and therefore eligible for Medicare. For the reasons set forth below, we will approve the Settlement and grant the Application for Approval of Attorneys' Fees in part.

## I. FACTS AND PROCEDURAL HISTORY

### A. Facts

On February 1, 1998, the County of Erie required that its Medicare-eligible retirees accept health care coverage under SecurityBlue, an HMO plan, or forfeit health care benefits from the County altogether. At the same time, younger, non-Medicare-eligible retirees were permitted to utilize a traditional indemnity plan. This Court has previously set forth the extensive differences between the two insurance plans and it is unnecessary to do so in detail again here. *Erie County Retirees Ass'n v. Erie County*, 91 F.Supp.2d 860, 868–880

---

1. HMOs are plans offered by federally qualified health maintenance organizations. Under them, the health care needs of the insured are coordinated by a primary care physician, who the insured selects from a list of providers authorized by the organization. HMOs generally do not require the insured to pay deductibles, and copayments are generally small or nonexistent. In exchange for the lower cost, insureds are required to coordi-

nate their care with their primary care physician, remain within the provider network for most services, and remain within a formulary of prescription drugs. Under traditional indemnity coverage, insureds are not restricted to certain providers or to a formulary, but are responsible for deductibles. There are a number of other differences between the coverages in addition to these basic ones.

(W.D.Pa.1999), *rev'd,* 220 F.3d 193 (3d Cir. 2000), *cert. denied,* 532 U.S. 913, 121 S.Ct. 1247, 149 L.Ed.2d 153 (2001). Briefly, however, under SecurityBlue Plaintiffs were required to coordinate their health care services through a primary care physician they selected from a list of authorized providers. The plan itself did not require Plaintiffs to pay deductibles and copayments were generally very low or nonexistent. In exchange for the lower cost, Plaintiffs were required to stay within a provider network for most services and were limited to a formulary for prescription drugs. In order to maintain coverage under SecurityBlue, Plaintiffs were required to pay their Medicare Part B premiums, which were $50 per month as of January 1, 2001. The younger retirees utilizing the traditional indemnity plan were, however, not required to remain within a provider network or prescription drug formulary but were required to pay deductibles. Additionally, since the younger retirees were not Medicare-eligible, they were not required to pay Medicare Part B premiums.

On October 1, 1998, the County replaced the younger retirees' traditional indemnity coverage with SelectBlue, a hybrid "point-of-service" plan that combined the features of an HMO with the features of a traditional indemnity plan. Under this plan, the younger retirees were permitted to select HMO or traditional indemnity coverage on an as-needed basis. They were not restricted to a prescription drug formulary. Pursuant to Highmark's underwriting criteria, Medicare-eligible retirees such as the Plaintiff class were ineligible for coverage under SelectBlue. Plaintiffs filed this class action alleging that the County violated the ADEA when it required them to accept SecurityBlue while offering younger retirees allegedly superior health care coverage, first under the traditional indemnity plan and subsequently under Select-

Blue. Various state law theories of liability were also asserted.

### B. Procedural History

This case has an extensive procedural background. On the parties' original cross-motions for summary judgment, this Court held that the ADEA, as amended by the Older Workers' Benefit Protection Act of 1990 ("OWBPA"), did not afford relief in the context of alleged discrepancies in health care plans offered by employers to their retirees. *Erie County Retirees Ass'n v. Erie County,* 91 F.Supp.2d 860, 868–880 (W.D.Pa.1999). On appeal, the Court of Appeals for the Third Circuit reversed and remanded for a determination of whether the safe harbor set forth in 29 U.S.C. § 623(f)(2)(B)(i) applied. *Erie County Retirees Ass'n v. County of Erie,* 220 F.3d 193 (3d Cir.2000). The United States Supreme Court denied Defendants' Petition for Certiorari. *Erie County, Pa. v. Erie County Retirees Ass'n,* 532 U.S. 913, 121 S.Ct. 1247, 149 L.Ed.2d 153 (2001).

Under the safe harbor provision and the regulations promulgated thereunder, employers may provide different benefit plans to employees and remain ADEA compliant so long as the plans provide equal benefits to the employees or are of equal cost to the employer (the "equal cost/equal benefit" rule). On remand, this Court held that the County was not entitled to the safe harbor. *Erie County Retirees Ass'n v. County of Erie,* 140 F.Supp.2d 466 (W.D.Pa.2001). On subsequently filed motions in limine, this Court ruled that, (1) at trial, the County would be permitted to offer offset evidence of Plaintiffs' cost-savings under SecurityBlue; *Erie County Retirees Ass'n v. County of Erie,* 166 F.Supp.2d 310 (W.D.Pa.2001); (2) fact issues precluded summary judgment on the issue of wilfulness; and (3) Plaintiffs would not be permitted to present evidence of

the cost incurred by the County in providing the choice option to younger retirees. *Erie County Retirees Ass'n v. County of Erie,* 166 F.Supp.2d 313 (W.D.Pa.2001). We also denied a motion to add class members. *Erie County Retirees Ass'n v. County of Erie,* 203 F.R.D. 225 (W.D.Pa. 2001). A Stipulation for Settlement of Class Action was thereafter negotiated, and a hearing on the fairness of the proposed settlement was held on December 20, 2001.

### C. Proposed Settlement

In an effort to comply with the above rulings, the County eliminated SelectBlue as an option for the younger retirees and required them to accept Keystone, an HMO plan similar to SecurityBlue, effective July 1, 2001. The Keystone plan is, in all material respects, similar to the coverage provided under SecurityBlue. For instance, the younger retirees enrolled in the Keystone plan are required to coordinate their health care services with a primary care physician and to remain within a prescription drug formulary. Also effective July 1, 2001, the younger retirees are responsible for paying a monthly amount equal to the monthly amount of Plaintiffs' Medicare Part B premiums. Plaintiffs do not concede that the implementation of the Keystone plan and the monthly charge brought the County into compliance with the ADEA, but admit that all or almost all of the discrepancies in the cost and quality of their health care benefits and those provided to younger retirees prior to July 1, 2001 were eliminated when the County made the changes. Plaintiffs' Memorandum in Support of Settlement at 6–7.

The Settlement provides for a total payment of $350,000 from the County to Plaintiffs. Stipulation for Settlement of Class Action at ¶ 8. The class consists of 114 members. Of the $350,000, Plaintiffs' counsel request an award of fees and costs in the amount of $159,464.82. Application for Approval of Attorneys' Fees at 3. The Settlement further provides for the release of all claims asserted on behalf of the class through the date of court approval of the Settlement. *Id.*

### II. DISCUSSION

### A. The Stipulation for Settlement of Class Action

Federal Rule of Civil Procedure 23(e) provides that a class action may not be dismissed or compromised without the approval of the Court and the notification of all class members. Fed.R.Civ.P. 23(e). The Court of Appeals for the Third Circuit has directed that Rule 23(e) requires district courts to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished." *In re Cendant Corp. Litigation,* 264 F.3d 201, 231 (3d Cir.2001), *cert. denied,* 70 USLW 3445, —— U.S. ——, 122 S.Ct. 1300, —— L.Ed.2d —— (Mar. 18, 2002) (*quoting In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liability Litig.,* 55 F.3d 768, 785 (3d Cir.1995), *cert. denied,* 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995)). The District Court acts as a "fiduciary guarding the rights of absent class members and must determine that the proffered settlement is 'fair, reasonable, and adequate.'" *Id.* (*quoting GM Trucks,* 55 F.3d at 785). In its analysis, the Court must consider nine factors first set forth in *Girsh v. Jepson,* 521 F.2d 153 (3d Cir.1975). These factors are:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery; and

(9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation.

*In re Cendant Corp. Litigation,* 264 F.3d at 232 (*citing Girsh,* 521 F.2d at 157). The proponents of a settlement bear the burden of proving that these factors weigh in favor of approval. *Id.* (*citing GM Trucks,* 55 F.3d at 785). We will consider each factor in turn.

### 1. Complexity, Expense and Likely Duration of the Litigation

■ The first *Girsh* factor requires the Court to consider "the probable costs, in both time and money, of continued litigation." *In re Cendant,* 264 F.3d at 233 (*quoting GM Trucks,* 55 F.3d at 812). The purpose of considering this factor is to determine the extent of the benefit that would be gained from settling the claim amicably. *GM Trucks,* 55 F.3d at 812.

This case has been ongoing for more than three years and has already consumed a substantial amount of time and engendered significant costs. To date, Plaintiffs' counsel has exceeded one thousand hours in combined attorney and paralegal time. Ex. A to Application for Approval of Attorneys' Fees. If this matter were not settled and proceeded to trial and potential further appeals, Plaintiffs' counsel estimates that the additional fees and costs would exceed those incurred to date. Plaintiffs' Memorandum in Support of Settlement at 15. We agree.

The presentation of Plaintiffs' damages at trial would be both factually and legally complex. The difficulty arises, in part, from the numerous differences between the three health care plans at issue as well as the individualized nature of each Plaintiff's utilization of SecurityBlue. Plaintiffs' counsel indicated at oral argument that settling now would eliminate the need for expert witnesses to analyze the statistical data and consequently, would avoid the fees that these witnesses would charge. Hearing on Fairness of Proposed Settlement at 9. Defendants, on the other hand, have expressed the intention to object to Plaintiffs' statistical modeling evidence to the extent that calculations of actual data could be completed. *Id.* at 25. Regardless of the ultimate methodology employed, the effort that would be necessary to accurately analyze and present Plaintiffs' damages to a jury would be monumental.

The length and difficulty is compounded by this Court's previous ruling that the County would be permitted to offer evidence demonstrating that Plaintiffs' damages were offset by savings and benefits that were unique to SecurityBlue. *Erie County Retirees Ass'n v. County of Erie,* 166 F.Supp.2d 310 (W.D.Pa.2001). For instance, if this matter were tried, it is the Defendants' intention to offer evidence of deductibles and co-insurance payments that the younger retirees paid under the traditional indemnity plan that Plaintiffs were not required to pay under SecurityBlue. Further, the Defendants have expressed the intention to offer evidence of particular benefits that the class members received under SecurityBlue, such as benefits for vision and hearing services, that the younger retirees did not receive under either the indemnity plan or SelectBlue. Hearing on Fairness of Proposed Settlement at 23. The nature of the Defendants'

evidence on the issue of offset would be equally involved and complex.

In sum, continued litigation in this case would undoubtedly be time-consuming and further delay the Plaintiffs' recovery. *See In re Computron Software, Inc. Sec. Litig,* 6 F.Supp.2d 313, 317 (D.N.J.1998) (even if class recovered a larger judgment at trial, additional delay would be caused by trial, post-trial motions and appellate process); *In re Safety Components Inc. Securities Litig.,* 166 F.Supp.2d 72, 85 (D.N.J.2001). Accordingly, we find that the first *Girsh* factor weighs heavily in favor of approving the Settlement.

### 2. The Reaction of the Class to the Settlement

This factor "attempts to gauge whether members of the class support the settlement." *In re Safety Components,* 166 F.Supp.2d at 85 (*quoting In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d 283, 317 (3d Cir.1998), *cert. denied,* 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d (1999)). In analyzing this factor, the Court is to examine the "number and vociferousness of the objectors." *Id.* (*quoting GM Trucks,* 55 F.3d at 312). Practical realities of class actions have led a number of courts to exercise caution in inferring support from a small number of objectors to a sophisticated settlement. *Id.* (*citing GM Trucks,* 55 F.3d at 812).

There have been no objections to the Settlement to date, either formally or informally. Gary Eiben, Esq., Hearing on Fairness of Proposed Settlement Held December 20, 2001 at 18 (Clerk's Office has received no objections, and counsel has received no objections through the mail or by phone). Although we do not afford significant weight to the lack of objections, this case is different than many in that the class is relatively small and is entirely comprised of members who affirmatively opted into the class rather than being in-

cluded because of a failure to opt-out. *Cf. In re Safety Components,* 166 F.Supp.2d at 82 (class consisted of more than 4400 members and members were included in the class unless they filed a request to opt out by a specified date) and *In re Cendant,* 264 F.3d 201, 226 (3d Cir.2001) (class consisted of approximately 100,000 members and members were included unless they opted out by a specified date). We therefore conclude that the second *Girsh* factor weighs slightly in favor of approving the Settlement.

### 3. Stage of the Proceedings

This factor "captures the degree of case development that class counsel have accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Cendant,* 264 F.3d at 235 (*citing GM Trucks,* 55 F.3d at 813). The stage of the proceedings is measured in "reference to the commencement of proceedings either in the class action at issue or some related proceeding." *GM Trucks,* 55 F.3d at 813.

This factor militates strongly in favor of approving the Settlement in this case. The Court is satisfied that counsel for both parties have a thorough understanding of the strengths and weaknesses of their respective positions at this time. As we observed earlier, the action was commenced more than three years ago and in light of the Third Circuit's determination that the ADEA applies in this context and our most recent determination that the safe harbor set forth in 29 U.S.C. § 623(f)(2)(B)(i) does not apply, liability has been established. Additionally, the parties agree on the calculation of the single largest item of damages, the Medicare Part B premiums required of Plaintiffs but not required of the younger retir-

ees during he relevant time.[2]

#### 4. Risks of Establishing Liability

This factor is considered in order to "examine what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them." *In re Cendant Corp. Litig.*, 264 F.3d at 237 (*citing GM Trucks*, 55 F.3d at 814). The inquiry "requires a balancing of the likelihood of success if 'the case were taken to trial against the benefits of immediate settlement.'" *In re Safety Components*, 166 F.Supp.2d at 89 (*quoting In re Prudential Ins.*, 148 F.3d at 319).

This factor does not weigh for or against approval of the Settlement in this case. Liability has been established by the collective decisions of the Third Circuit and this Court, and by settling at this time, Plaintiffs are neither foregoing an opportunity to establish liability at trial nor risking the possibility that a trial would result in a finding that the County is not liable (because a trial would be limited to the issue of damages). Due to the procedural posture of this case, therefore, the fourth *Girsh* factor is not implicated.

#### 5. Risks of Establishing Damages

This factor is similar to the fourth *Girsh* factor in that it "attempts to measure the expected value of litigating the action rather than settling it at the current time." *In re Cendant*, 264 F.3d at 238 (*citing GM Trucks*, 55 F.3d at 816). In the normal course, proving damages involves many of the same risks as proving liability because the former is contingent upon the latter. *In re Safety Components*, 166 F.Supp.2d at 90.

As discussed above, while liability has been established, the damage aspect of this case remains somewhat murky. Given the factual and legal complexity with respect to the proof of damages at trial, there is considerable risk that Plaintiffs would ultimately realize far less than their projected optimum result. This uncertainty is driven in part by questions regarding the accuracy of Plaintiffs' statistical information, the admissibility of this information, and this Court's previous ruling that would permit the County to offer evidence in the way of offset. In light of the significant risks to Plaintiffs in establishing damages at trial, we find that the fifth *Girsh* factor weighs strongly in favor of approving the Settlement.

#### 6. Risks of Maintaining the Class Action Through Trial

The sixth factor that must be considered under *Girsh* is "the risks of maintaining the class action through the trial." *Girsh*, 521 F.2d at 157. Subsequent to its decision in *Girsh*, the Court of Appeals for the Third Circuit indicated that the examination of this factor is "perfunctory," because the district court may always decertify or

---

**2.** The following exchange on this point occurred at the fairness hearing:

> MR. EIBEN: In doing this analysis, your Honor, there is a baseline number, that baseline number is $204,801. Now, what does that number reflect? The largest element of damages in this case, and if you're looking at our memo, I believe it's in page seven of our memo in support of the settlement, we have the calculations. This reflects differences in premium payment which had to be made by members of the plaintiff class, as opposed to the nonmem-

> bers. And if you make those calculations for the three specific time periods which are at issue, this is the number you come [sic] with, $204,801. Again, I would turn to Attorney Lanzillo and ask you if they basically agree with that calculation?
>
> MR. LANZILLO: That's the number I arrived at as well.
>
> THE COURT: So that's a hard figure concerning which there is no real dispute?
>
> MR. LANZILLO: That's correct.

Hearing on Fairness of Proposed Settlement Held on December 20, 2001 at 6.

modify a class that becomes unmanageable. *In re Prudential Ins.*, 148 F.3d at 321; *In re Safety Components*, 166 F.Supp.2d at 91. Here, we find that the small size of the class coupled with the advanced stage of the proceedings lessens the risk of decertification or modification during trial. In light of the Third Circuit's characterization of the factor, however, we will attribute it little weight.

### 7. The Ability of the Defendants to Withstand a Greater Judgment

The seventh *Girsh* factor concerns "whether the defendants could withstand a judgment for an amount significantly greater than the Settlement." *In re Cendant*, 264 F.3d at 240. In this case, while it could reasonably be presumed that the County could withstand a somewhat larger judgment, unique problems could potentially be encountered due to the County's municipal rather than private status. Accordingly, we find that this factor is largely neutral.

### 8. The Final *Girsh* Factors: The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and in Light of Litigation Risks

The final *Girsh* factors collectively ask whether "the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *In re Prudential Ins. Co.*, 148 F.3d at 322. The touchstone of this examination is the "economic valuation of the proposed settlement." *In re Safety Components*, 166 F.Supp.2d at 92 (*quoting In re Aetna Sec. Litig.*, No. MDL 1219, 2001 WL 20928 at *11 (E.D.Pa. Jan.4, 2001)). A court generally must take "the present value of the damages plaintiff would likely recover if successful, appropriately discounted for the risk of not prevailing, [to] be compared with the amount of the proposed settlement." *Id.* (*quoting In re Aetna*, 2001 WL 20928 at *11). Discounting to present value is not necessary when the reasonableness of the settlement can be fairly judged. *Id.* (*citing In re Aetna*, 2001 WL 20928 at *11).

These factors weigh strongly in favor of approving the proposed settlement. As an initial matter, because the County replaced the younger retirees' SelectBlue plan with Keystone, an HMO similar to SecurityBlue, on July 1, 2001, the damages in this case are fixed.[3] Plaintiffs estimate that the best possible recovery, exclusive of attorneys' fees, is $300,000. Plaintiffs' Memorandum in Support of Settlement at 18. Of this amount, the parties agree that $204,801 is a solid figure representing the sum of the Medicare Part B premiums that Plaintiffs paid (and that the younger retirees did not pay) during the time younger retirees were insured under the traditional indemnity and SelectBlue plans. Hearing on Fairness of Proposed Settlement at 6. The remaining $95,000 is derived in large measure from the statistical analysis performed regarding copayment differences for specialists, emergency room visits, physical therapy, outpatient mental health, prescription drugs, and gynecological exams under the various plans.

The risks of litigation in this case concern the difficulty of proving the remaining $95,000 figure and the offset evidence that would be presented by the County. Plaintiffs themselves admit weaknesses in their statistical figures, and if the County was

---

**3.** Plaintiffs, without conceding the point, state in their memorandum that all or almost all of the discrimination between the cost and quality of their health benefits and those offered to the younger retirees appears to have been eliminated as of July 1, 2001, the date that the younger retirees were placed into the Keystone plan. Plaintiffs' Memorandum in Support of Settlement at 6–7.

entirely successful on all of its offset arguments, the Plaintiffs' damages would be reduced by $127,860. Memorandum in Support of Settlement at 10; Hearing on Fairness of Proposed Settlement at 22. Thus, there would be a palpable risk to Plaintiffs' recovery if litigation continued.

Of the total Settlement amount of $350,000, Plaintiffs' counsel requests a fee award of $159,464.82. Application for Approval of Attorneys' Fees at 3. This would leave Plaintiffs with $190,535.18, almost two-thirds of the best possible recovery they could expect. As we will explain below, Plaintiffs will in fact receive somewhat more than this amount due to our modification of the Application for Approval of Attorneys' Fees.

In analyzing the final *Girsh* factors, it is recognized that "settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution ..." *In re Safety Components*, 166 F.Supp.2d at 92 (*quoting In Re Aetna*, 2001 WL 20928 at *11). Here, we find that the amount of the proposed settlement is clearly within the range of reasonableness given the best possible recovery and the significant risks presented by continued litigation.

9. Summary of the *Girsh* Analysis

In this instance, six of the nine *Girsh* factors weigh in favor of approving the Settlement, and the remaining three are neutral. Furthermore, five of the six factors that counsel in favor of approving the Settlement do so strongly. It is clear that continued litigation in this case would be extremely time-consuming, complex, and expensive. The stage of the proceedings is such that counsel are fully aware of the merits of their positions. The risk to Plaintiffs of failing to establish damages commensurate with their best case scenario is substantial, and the Settlement amount is very reasonable in light of the

best possible recovery and the risks of litigation involved. Additionally, no class members object to the Settlement. We, accordingly, will approve the Settlement.

### B.   The Application for Approval of Attorneys' Fees

It is incumbent on a District Court to undertake a thorough judicial review of attorneys' fees applications in class action settlements. *GM Trucks*, 55 F.3d at 819. There are two methods that are regularly employed in conducting this review, each of which has "distinct attributes suiting [it] to particular types of cases." *Id.* at 821. The lodestar method, which begins with a multiplication of the number of hours expended and the hourly rate, is typically used in statutory fee-shifting cases to ensure that counsel undertaking socially beneficial litigation are adequately compensated regardless of the monetary recovery achieved for the class. *Id.* The percentage of recovery method, which considers whether the fee requested is an appropriate percentage of the total recovery achieved, is used in common fund cases on the theory that the class would be unjustly enriched if it did not adequately compensate its counsel for achieving a substantial monetary result. *Id.* It is "sensible for a court to use a second method of fee approval to cross check its conclusion under the first method ..." *Id.* at 820.

■ Counsel for Plaintiffs urge this Court to use the lodestar method as the primary method of review. Plaintiffs' Memorandum in Support of Attorneys' Fees at 2. Here, we find that it is more appropriate to use the percentage of recovery method since the Settlement releases the Defendants from liability for both damages and attorneys' fees. *See Lazy Oil Co. v. Witco Corp.*, 95 F.Supp.2d 290, 340 (W.D.Pa.1997), *aff'd*, 166 F.3d 581 (3d Cir.1999), *cert. denied*, 528 U.S. 874,

120 S.Ct. 178, 145 L.Ed.2d 150 (1999) (citing cases); *see also GM Trucks,* 55 F.3d at 821 ("The rationale behind the percentage of recovery method also applies in situations where, although the parties claim that the fee and settlement are independent, they actually come from the same source.").[4] "[W]hen a settlement fund is created in exchange for release of the defendant's liability both for damages and for statutory attorneys' fees, equitable fund principles must govern the court's award of attorneys' fees." *Id.* (*citing Skelton v. General Motors Corp.,* 860 F.2d 250, 256 (7th Cir.1988), *cert. denied,* 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989)). Accordingly, we will utilize the percentage of recovery method as our primary method of review in this case, and will use the lodestar method as a cross-check.

Plaintiffs' counsel requests a total award of fees and costs in this case of $159,464.82. The documentation appended to their application provides that through December 6, 2001, fees were generated in the amount of $157,457.50 and costs in the amount of $11,618.14, for a total of $169,075.64. Application for Approval of Attorneys' Fees at 3. Because of an agreement between counsel and the class to cap fees and expenses as of those incurred through November 1, 2001, however, the total amount documented is not requested and further, there is no documentation for work expended after December 6, 2001 because counsel stopped keeping track at that time.

There is no consensus on what percentage of a common fund is reasonable, although several courts in this circuit have observed that percentage of recovery fee awards generally range from 19% to 45%, with 25% being typical. *Lazy Oil,* 95 F.Supp.2d at 341 (citing cases). Subtracting expenses from the total request in this case, Plaintiffs' counsel seeks fees in the amount of $147,846.68, more than 42% of the Settlement fund.

Recently, in *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190 (3d Cir.2000), the Court of Appeals for the Third Circuit set forth the analysis that is to be conducted by a District Court when reviewing an application for attorneys' fees pursuant to the percentage of recovery method. *Id.* at 195 n. 1; *see also In re Safety Components,* 166 F.Supp.2d at 93–94. The Court stated that among other factors, the reviewing court should consider the following: (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fee request; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards

4. The Stipulation for Settlement of Class Action provides in pertinent part:
    8. Pursuant to the Settlement Agreement, the County of Erie will pay the sum of Three Hundred Fifty Thousand and no/100 Dollars ($350,000.00) to the Plaintiffs and will pay costs billed by Highmark Blue Cross Blue Shield in conjunction with the production of information by Highmark Blue Cross Blue shield pertaining to claims for medical and related services and for prescription drugs. The Erie County Employees' Retirement Board will make no payment. No other payment or consideration will be made by or on behalf of Defendants. In exchange, the Plaintiffs' represent will execute, on behalf of the class, a release of all claims asserted on behalf of the class through the date of court approval of the settlement.
    12. As part of the request to the Court for approval of the settlement, counsel for Plaintiffs will apply to the Court for allowances of attorneys' fees and expenses to be paid out of the proceeds of the settlement.

in similar cases. *Gunter*, 223 F.3d at 194 n. 1 (*citing In re Prudential*, 148 F.3d at 336–40 and *GM Trucks*, 55 F.3d at 819–22). We will consider each of the seven enumerated factors in turn, as well as one additional factor we find to be pertinent to this case.

### 1. Size of Fund and Number of Persons Benefitted

The general principle at work in this factor is that as the size of the settlement fund increases, the appropriate percentage allocated to attorneys' fees decreases. *In re Prudential*, 148 F.3d at 339; *In re Safety Components*, 166 F.Supp.2d at 95. The rationale for this inverse relationship is the belief that a higher fee should not merely be the consequence of a large class that bears "no direct relationship to the efforts of counsel." *In re Prudential*, 148 F.3d at 339.

The size of both the class and the fund in this case are relatively modest, and consequently we perceive no danger of an inflated fee award due to a very large class or recovery. As the size of the settlement fund decreases, however, so, obviously, does the size of each class member's recovery. Here, subtracting the amount of the requested fees and costs (which is collectively more than 45% of the total fund), each class member would receive $1,671.36. In light of the fund and class size in this case, as well as the other factors discussed more fully below, we do not believe that a percentage of recovery award in the median or lower range, *i.e.* 25% or less, is appropriate. Conversely, given the range of recovery the class members can expect, we find that some reduction of the requested fee award of approximately 42% of the settlement fund is justified.

### 2. Objections to Settlement Terms and/or Fee Application

The second factor to be considered under *Gunter* is the "presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel." *Gunter*, 223 F.3d at 195 n. 1. Admittedly, this factor weighs in favor of the percentage requested by Plaintiffs' counsel. As observed in our previous discussion of the *Girsh* factors, there have been no objections to the Settlement or to the attorneys' fees request to date. The notice sent to the class members clearly stated that total attorneys' fees and expenses would not exceed $159,000, and that they could each anticipate receiving an amount between $1500 and $1700. Given the complexity of the analysis with respect to the attorneys' fees request, we will afford some, albeit not significant, weight to the lack of objections.

### 3. Skill and Efficiency of Attorneys Involved

A stated goal in percentage fee-award cases is "ensuring that competent counsel continue to be willing to undertake risky, complex and novel litigation." *Id.* at 198; *In re Safety Components*, 166 F.Supp.2d at 96. We can state with no hesitation that the quality of the legal work performed by Plaintiffs' counsel throughout this litigation has been of the very highest caliber. The attorney biographies speak to the experience and competence of Plaintiffs' counsel and this Court can independently attest to the same based not only on this case, but also on several other cases that have come before this Court over the years. We therefore regard this factor as weighing in favor of a fee award on the higher end of the spectrum.

### 4. Complexity and Duration of Litigation

The fourth factor we must consider under *Gunter* is the "complexity and duration of the litigation." *Gunter*, 223 F.3d at 195 n. 1. We find that this factor weighs in

favor of a salutary fee award in this case. The novelty of the central issue, the applicability of the ADEA to health benefits offered by employers to their retirees, required substantial research and preparation at the summary judgment stage and ultimately, required appellate work before the United States Court of Appeals for the Third Circuit and the United States Supreme Court. Notably, Plaintiffs' counsel were successful in both their appeal to the Third Circuit and in their opposition to the petition for certiorari filed by the Defendants. Additional work necessitated after remand from the Third Circuit was itself complex and time-consuming. Further, it is clear that this case would consume considerably more time if not settled presently. This factor, accordingly, also weighs in favor of a fee award above the percentage that is typically awarded in common fund cases.

### 5. Risk of Nonpayment

The Third Circuit found in *Gunter* that there was a risk of nonpayment both because "the defendants were close to insolvency, and because other classes of plaintiffs in similar cases against the defendants had lost on similar legal theories." *Gunter*, 223 F.3d at 199. The Court accordingly determined that this risk should have been considered by the District Court in its analysis because "the risk that counsel takes in prosecuting a client's case should also be considered when assessing a fee award." *Id.*

Here, we find that Plaintiffs' counsel undertook a substantial risk in prosecuting this case given the novelty of the legal issues presented and the palpable risk that they would not be successful. At the commencement of this litigation, the legal landscape on the applicability of the ADEA to health benefits offered by employers to their retirees was essentially barren. Accordingly, we find that this factor weighs in favor of a percentage award that is above the norm.

### 6. Amount of Time Devoted to Case by Plaintiffs' Counsel

The sixth factor we are to consider under *Gunter* is the "amount of time devoted to the case by plaintiffs' counsel." *Gunter*, 223 F.3d at 195 n. 1. As of November 1, 2001, Plaintiffs' counsel expended 1036.10 hours on this case.[5] Ex. A to Application for Approval of Attorneys' Fees. We have carefully reviewed in detail Plaintiffs' counsels' billing statements and find that they adequately describe the nature of the legal services performed and that the time spent on those services was appropriate. As we will discuss more fully below, a multiplication of the hours counsel expended by a reasonable hourly rate would give rise to a fee amount exceeding 45% of the common fund. That the time expended would entitle counsel to an award in this percentage range based on a reasonable rate weighs in favor of a percentage award higher than the average.

### 7. Awards in Similar Cases

The seventh *Gunter* factor we must consider is "awards in similar cases." *Gunter*, 223 F.3d at 195 n. 1. As previously discussed, most fee awards in common fund cases range from 19% to 45% of the settlement fund, with 25% being the median. *Lazy Oil Co. v. Witco Corp.*, 95 F.Supp.2d 290, 341 (W.D.Pa.1997); *see also In re Safety Components*, 166 F.Supp.2d at 101. In arriving at an appropriate percentage,

---

**5.** Counsel for Plaintiffs have only submitted documentation for hours expended through November 1, 2001 due to an agreement they have with Plaintiffs to cap their fees at $159,464.82, the amount reached by multiplying the hours expended through November 1, 2001 by their hourly rates ($175/hour for attorneys and $95/hour for paralegals). Plaintiffs' Memorandum in Support of Attorneys' Fees at 1.

we "may not rely on a formulaic application of the appropriate range in awarding fees but must consider the relevant circumstances of the particular case." *In re Safety Components*, 166 F.Supp.2d at 101 (*citing In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 736 (3d Cir.2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 202, 151 L.Ed.2d 143 (2001)).

Many class action settlements involve multi-million dollar funds, and the 25% benchmark is often appropriate in these cases in order to prevent a windfall to counsel. *Lazy Oil*, 95 F.Supp.2d at 342; *see also In re Safety Components*, 166 F.Supp.2d at 101 (providing a representative list of class action settlements with funds ranging from $1.46 million to $37.1 million). Even the fund in *In re Skelton*, 860 F.2d 250 (7th Cir.1988), a case similar to ours in that common fund principles were held to be appropriate notwithstanding that the suit was based on a fee-shifting statute, was $17 million, considerably more than the fund involved here. In cases with very large funds, it is appropriate for a court to actively guard against fee awards that are so high that they bear little relationship to the effort expended by counsel and accordingly, it is well established that as the size of the fund increases, the size of the fee award decreases. *Lazy Oil*, 95 F.Supp.2d at 342.

Fee awards ranging from thirty to forty-three percent have been awarded in cases with funds ranging from $400,000 to $6.5 million, funds which are comparatively smaller than many. *Id.* at 342–343 (citing cases and noting a number of awards ranging from thirty to thirty-six percent in such cases and one award of close to forty-four percent although less than ten percent of this award was to come from the fund and the remaining amount was to be paid directly by the defendants).

In *Ratner v. Bennett*, No. Civ.A. 92–4701, 1996 WL 243645 (E.D.Pa. May 8, 1996), the court considered a fee request in a class action settlement with a common fund of $400,000 and a class membership of 455 persons. Plaintiffs' counsel requested a fee award of $152,000, 38% of the total fund. *Id.* at *8. The court determined that an award of 35% was reasonable, and awarded a fee of $140,000, stating:

> [t]he Court's review reveals that the class members were well served by attorneys who are highly experienced and nationally recognized in class action litigation generally and securities litigation in particular. Plaintiffs' counsel expended 1427 hours on this litigation, excluding time expended on the fee petition itself, and their work was efficiently conducted. Counsel diligently developed the facts and legal issues, analyzed a multitude of documents, were steadfast in settlement negotiations with defendants, and, ultimately, achieved an excellent result, especially given the obstacles they faced in establishing liability and damages. The Court notes, moreover, that because the common fund is relatively small, it is appropriate to give a higher percentage than that awarded in cases which have resulted in substantially larger funds. As the Court pointed out above, although this is a relatively small case, the factual and legal issues were quite complex, and class counsel should not be penalized for undertaking and pursuing this litigation as vigorously as it would a much larger case which promises a more substantial fee award.

*Id.* at *9. *Ratner* is similar to our case in a number of respects. First, the size of the *Ratner* fund is comparable to the fund in our case. Second, the *Ratner* class, although larger than ours, is smaller than many classes. Third, the quality of the legal representation in *Ratner*, as in this

case, was of the highest caliber. And finally, the legal issues in *Ratner* were complex and the outcome was not certain. The same was true in our case.

We observe that in common fund cases, the role of Plaintiffs' counsel in fee petitions "changes from one of a fiduciary for the clients to that of a claimant against the fund created from the clients' benefit." Report of the Third Circuit Task Force, Court Awarded Attorney Fees, 108 F.R.D. 237, 255 (1985). Given the previously described range of fee awards, we find that Plaintiffs' counsels' request for an award that is in excess of 42% of the fund is somewhat high. We do find, however, that this factor weighs in favor of an award that is on the upper end of the spectrum. ·

### 8. Nature of the Action

The Third Circuit made clear in *Gunter* that the seven enumerated factors are not exhaustive. *Gunter*, 223 F.3d at 194 n. 1. ("Among other things, these factors include . . ."). Here, we find that the nature of the action is an additional factor appropriately considered in passing on Plaintiffs' counsels' fee request. Unlike the usual common fund case, this case was brought under the ADEA, a federal discrimination statute which contains a fee-shifting provision. *See* 29 U.S.C. § 626(b) (expressly incorporating attorney fee provisions of the Fair Labor Standards Act, 29 U.S.C. § 216(b)). That this case is appropriately analyzed under common fund principles, therefore, is not due to the underlying nature of the action but rather to the common fund nature of the Settlement the parties have reached. As we have already noted, the Settlement provides that both damages and attorneys' fees are to be paid from the Settlement fund.

We find the fact that this case is appropriately analyzed under common fund principles due to the style of the Settlement rather than to the underlying cause of action to be a characteristic that materially distinguishes it from the usual common fund case. In *GM Trucks*, the Third Circuit observed that the lodestar method is generally used in fee-shifting cases in part because it "assures counsel undertaking socially beneficial litigation (as legislatively identified by the statutory fee shifting provision) an adequate fee irrespective of the monetary value of the final relief achieved for the class." *GM Trucks*, 55 F.3d at 821. Conversely, the Court noted in the same case that the percentage-of-recovery method is employed in cases without fee-shifting provisions because in these case, failing to bestow a portion of a successfully obtained fund on counsel would unjustly enrich the class members. *Id.* In this regard, the Court observed that, "[b]ecause these cases are not presumed to serve the public interest (as evidenced by the lack of a fee statute), there is no social policy reason that demands an adequate fee." *Id.*

Here, however, 29 U.S.C. § 626(b), which incorporates the fee shifting provision of the Fair Labor Standards Act, 29 U.S.C. § 216(b), is a pertinent legislative determination that an adequate fee is warranted. Plaintiffs' counsel has foregone the opportunity to petition for fees under this provision by settling at this time. One criticism of the lodestar method is that it can give "class counsel the incentive to delay settlement in order to run up fees . . ." *GM Trucks*, 55 F.3d at 821. Plaintiffs' counsel has not delayed settlement for this purpose here. We are further mindful that the common fund style of settlement used in this case may have been a significant variable in the Defendants' decision to settle, and should generally be encouraged to the extent that it facilitates settlement.

In sum on this point, this case is different from many in which common fund

principles are used, and from *Ratner* in particular (which we used as a comparator above), in that the underlying nature of the action is such that an adequate fee is warranted as a matter of policy. The common fund is also small enough that the matter of adequate compensation is a true concern. We find that this distinction is a relevant factor that weighs in favor of an award that is higher than those typically awarded in common fund cases that are not based on fee-shifting statutes.

9. Summary of the *Gunter* Analysis

Our application of the analysis set forth in *Gunter* convinces us that a fee award of 38% of the total fund, or $133,000, strikes the appropriate balance between protecting the class members' interest in an adequate recovery and appropriately compensating counsel for their highly skilled efforts. Accordingly, we will award counsel $133,000 in fees to be paid from the common fund. This amount is not inclusive of expenses, which we will address below.

10. Lodestar Cross–Check

In common fund cases, it is "advisable to cross-check the percentage award counsel asks for against the lodestar method of awarding fees so as to insure that plaintiffs' lawyers are not receiving an excessive fee at their clients' expense." *Gunter*, 223 F.3d at 199 (*citing In re Prudential*, 148 F.3d at 333). The lodestar is calculated "by multiplying the number of hours [counsel] reasonably worked on a client's case by a reasonable hourly billing rate for such services given the geographical area, the nature of the services provided, and the experience of the lawyer." *Gunter*, 223 F.3d at 195 n. 1. After calculating the lodestar, "the court may, in certain circumstances, adjust the award upward or downward to reflect the particular circumstances of a given case." *Id.* (*citing In re Prudential*, 148 F.3d at 338–40 and *GM*

*Trucks*, 55 F.3d at 821–22). A court's application of the lodestar must be adequately explained. *Id.* (*citing In re Prudential*, 148 F.3d at 340–41).

The fee application submitted by Plaintiffs' counsel documents a total of 737.85 hours of attorney time and 298.25 hours of paralegal time through December 6, 2001. Ex. A to Application for Approval of Attorneys' Fees. At a rate of $175 per hour for attorney work and $95 per hour for paralegal work, a lodestar of $157,457.50 is calculated. Upon our detailed review of the fee petition, we are satisfied that the number of hours expended was reasonable and that the hourly rates submitted were reasonable. Plaintiffs' counsel has not requested a multiplier.

As observed above, many common fund cases involve very large common funds and in these cases the lodestar cross-check ensures that attorneys do not receive "excessive fee[s] at their clients' expense." *Gunter*, 223 F.3d at 199 (*citing In re Prudential*, 148 F.3d at 340–41). Here, the lodestar cross-check illustrates that the percentage fee award we have selected is not excessive as the lodestar calculation in fact exceeds the percentage amount we have selected. In light of the fact that the lodestar is higher than the percentage, we also find that our award is not unreasonably low. As compared to *Ratner*, a case with a similarly sized common fund and a lodestar, like ours, that was greater than the percentage selected by the court, the discrepancy between the two amounts is not substantial. *Cf. Ratner*, 1996 WL at 243645 at *9 (lodestar calculation was $280,880.35, more than double the $140,000 fee award which represented 35% of the common fund). Here, the discrepancy is $24,457.50. The lodestar cross-check in this case, therefore, buttresses our conclusion that the 38% award we have selected is appropriate.

### C. *Expenses*

■ Plaintiffs' counsel has documented expenses in the amount of $11,618.14. App. A to Application for Approval of Attorneys' Fees. Of this amount, $6,237 was paid by members of the class and will be reimbursed to them upon disbursement of the settlement. Plaintiffs' Memorandum in Support of Settlement at 3. The expenses were incurred in copying, filing fees, postage, mileage, parking, on-line research and consultations. We find that these expenses were reasonable and appropriate in the course of this litigation, and will therefore award Plaintiffs' counsel $11,618.14 in expenses in addition to the $133,000 we will award in attorneys' fees.[6]

An appropriate order follows.

### ORDER

AND NOW, this ___ day of March, 2002, for the reasons stated in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that:

(1) The Stipulation for Settlement of Class Action [Doc. No. 95] is hereby APPROVED pursuant to Fed.R.Civ.P. 23(e); and

(2) Plaintiffs' Application for Approval of Attorneys' Fees [Doc. No. 99] is GRANTED to the extent set forth in the accompanying Memorandum Opinion.

The Clerk is directed to mark this matter CLOSED.

---

6. Our total award therefore will be $144,618.14, slightly more than 41% of the settlement fund. Because Plaintiffs' counsel agreed to cap both fees and expenses at $159,464.82, we observe that this total is within this limitation. Our award leaves the sum of $205,381.86 for the class, which translates to $1801.60 for each class member.