**Richard M. BARR, on behalf of himself and all others similarly situated, Plaintiff,**

v.

**MATRIA HEALTHCARE, INC.; Parker H. Petit; Jeffrey D. Koepsell; and George W. Dunaway, Defendants.**

Civil Action File No. 1:03–CV–2007–TWT.

United States District Court, N.D. Georgia, Atlanta Division.

July 7, 2004.

Gregory M. Nespole, David L. Wales, Scott J. Farrell, Wolf, Haldenstein, Adler, Freeman & Herz, New York, NY, Martin D. Chitwood, Lauren S. Antonino, David Andrew Bain, Chitwood & Harley, Atlanta, GA, Marc S. Henzel, Office of Marc S. Henzel, Bala Cynwyd, PA, James E. Miller, Shepherd, Finkelman, Miller & Shah, Hartford, CT, for Plaintiff.

Peter Quirk Bassett, Todd Richard David, Oni A. Holley, Alston & Bird, Atlanta, GA, for Defendants.

## ORDER

THRASH, District Judge.

This is a securities fraud class action. It is before the Court on the Defendants' Motion to Dismiss First Amended Class Action Complaint [Doc. 26]. For the reasons set forth below, the Defendants' motion is GRANTED.

### I. BACKGROUND

Defendant Matria Healthcare, Inc. ("Matria") is a disease management company headquartered in Marietta, Georgia. Matria offers integrated health services to patients, physicians, health plans, and employers for the management of chronic diseases and medical conditions. Matria's business is divided into two principal segments. The Health Enhancement Segment focuses on the cost-effective management of maternity patients and chronic illnesses requiring services such as respiratory therapy. The Diabetes Segment offers diabetes supplies and services. During the proposed class period, Defendant Parker H. Petit was the Chief Executive Officer, President, and Chairman of the Board of Matria. Defendant Jeffrey D. Koepsell was Matria's Chief Operating Officer and a member of its Board of Directors. Defendant George W. Dunaway was the company's Chief Financial Officer.

The Plaintiff Richard M. Barr seeks to represent a class of Plaintiffs who purchased or otherwise acquired Matria securities between October 24, 2000, and June 25, 2002, (the "Class Period"). Barr purchased 200 shares of stock in Matria on December 5, 2001, at a price of $33.48 per share. He sold the stock on February 6, 2002, at a price of $21.95 per share. Barr alleges that he and other similarly situated Plaintiffs suffered damages stemming from the Defendants' alleged violations of

federal securities laws and the resultant artificial price inflation of Matria securities during the Class Period.

By the beginning of the Class Period, Matria's Health Enhancement Segment and its Diabetes Segment had grown substantially. Plaintiff Barr alleges that this rapid growth of Matria's business greatly outpaced Matria's information technology capabilities. Barr alleges that Matria's disease management service had experienced repeated system failures and could not perform effectively absent a significant system upgrade. No mention of these alleged technological problems, Barr contends, was made to the investing public. Rather, Matria and the Individual Defendants continued to assert that Matria held a competitive advantage in the disease management field based on its ability to integrate healthcare information and bolster connectivity. Matria, Barr contends, purported to pursue a "one-stop shop" approach, where all interrelated patient information could be accessed through a phone call or internet search. This and other information provided to Matria shareholders and the investing public, Barr concludes, were wholly misrepresentative of the state of affairs of the company.

The Plaintiff alleges that the truth was revealed on June 25, 2002. On that date, Matria issued a press release announcing that its outlook for the year 2002 needed to be adjusted downward. The press release stated:

> The primary factor contributing to the lower 2002 outlook is information system constraints in the pharmacy, laboratory and supplies component of the Company's Health Enhancement segment. This operation has grown rapidly over the last 18 months and, since last fall, has been in the process of implementing a state-of-the-art customer relationship management, billing, inventory and

pharmacy system.... We underestimated the system constraints that growth would cause....

(Defs.' Mot. Dismiss, Ex. A). In response to this release, the value of Matria stock dropped from nearly $12 per share to approximately $7 per share on heavy volume.

On July 17, 2003, Plaintiff Barr filed this action against Defendant Matria and the Individual Defendants. Barr alleged generally that the Defendants misrepresented the condition of Matria's business to inflate Matria's stock price until they revealed the company's problems in June 2002. This is the only securities fraud action filed with respect to the June 2002 plunge in Matria stock. The Defendants answered and moved to dismiss the complaint on October 8, 2003. At a scheduling conference, the Court gave the Plaintiff the option of responding to the Motion to Dismiss or filing an amended complaint. The Plaintiff chose to file an amended complaint, and this Court granted the Defendants' first Motion to Dismiss by order dated November 14, 2003. The Court construed the Plaintiff's Motion to Stay Defendants' Motion to Dismiss as a motion for leave to amend and granted leave to amend in the November 14, 2003, Order. The Plaintiff filed an amended complaint, alleging that the Defendants made misstatements and omissions with respect to:

> [F]our categories: (1) problems with the information technology systems and infrastructure in Matria's disease management operation; (2) problems associated with so-called "just-in-time" inventory and supply process in the Facet [Technologies] Division; (3) problems affecting margins in, and prospects for, the Women's Health Division; and (4) violations of Generally Accepted Accounting Principles ("GAAP") by failing to reserve for the loss to which Defendants knew Matria was exposed as a result of

a loan to a former officer, and by failing to disclose known, adverse trends that would negatively impact the Company's earnings.

(First Am. Compl. ¶ 16). Barr claims that the Defendants violated sections 10(b) and 20(a) of the Exchange Act of 1934, 15 U.S.C. §§ 78j(b) & 78t(a), and Rule 10b–5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b–5. The Defendants move to dismiss the Plaintiff's claims.

## II. *MOTION TO DISMISS STANDARD*

■■ A complaint should be dismissed under Rule 12(b)(6) only where it appears beyond doubt that no set of facts could support the plaintiff's claims for relief. Fed.R.Civ.P. 12(b)(6); *see Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Linder v. Portocarrero,* 963 F.2d 332 (11th Cir.1992). In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff. *See Quality Foods de Centro America, S.A. v. Latin American Agribusiness Development Corp., S.A.,* 711 F.2d 989, 994–95 (11th Cir.1983). Generally, notice pleading is all that is required for a valid complaint. *See Lombard's, Inc. v. Prince Mfg., Inc.,* 753 F.2d 974, 975 (11th Cir.1985), *cert. denied,* 474 U.S. 1082, 106 S.Ct. 851, 88 L.Ed.2d 892 (1986). Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. *Id.*

## III. *DISCUSSION*

■■ Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).

Rule 10b–5, promulgated by the Commission, states:

It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. Section 20(a) of the Exchange Act extends liability for a corporation's violations of Rule 10b–5 to the controlling persons of such corporation. 15 U.S.C. § 78t(a). "To succeed on a Rule 10b–5 fraud claim, a plaintiff must establish (1) a false statement or omission of material fact (2) made with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's injury." *Robbins v. Koger Properties, Inc.,* 116 F.3d 1441, 1447 (11th Cir.1997).

### A. *Standing*

■■ The Defendants argue, as a preliminary matter, that the Plaintiff lacks standing to bring these claims against the Defendants under the Exchange Act. If the named plaintiff in a class action cannot establish the requisite case or controversy between himself and the defendants, he cannot seek relief for anyone—neither for himself nor for any other member of the class. *Griffin v. Dugger,* 823 F.2d 1476, 1483 (11th Cir.1987). Barr contends that his purchase of shares at an artificially inflated price and subsequent sale of such shares at a loss constitutes the injury re-

quired to establish standing to sue. Case law from one circuit court and numerous district courts suggests that an in-and-out trader, one who both buys and sells his stock within the class period, can have standing as a class representative. *See, e.g., Wool v. Tandem Computers Inc.,* 818 F.2d 1433 (9th Cir.1987); *Hoffman v. Szyszko,* 1994 WL 721569 (N.D.Ill.1994); *In re Scott Paper Co. Securities Litigation,* 142 F.R.D. 611, Fed. Sec. L. Rep. ¶ 96,859 (E.D.Pa.1992); *Shields v. Smith,* 1992 WL 295179, Fed. Sec. L. Rep. ¶ 97,-001 (N.D.Cal.1992). The Ninth Circuit reached this result based upon the out-of-pocket rule, which fixes recoverable damages as "the difference between the purchase price and the value of the stock at the date of purchase." *Wool,* 818 F.2d at 1437 (quoting *Green v. Occidental Petroleum Corp.,* 541 F.2d 1335, 1344 (9th Cir. 1976) (Sneed, J., concurring)). The Eleventh Circuit also employs the out-of-pocket rule to measure damages in Rule 10b–5 actions. *Robbins v. Koger Properties, Inc.,* 116 F.3d 1441, 1447 n. 5 (11th Cir. 1997). The principle underpinning the out-of-pocket rule is that a plaintiff's injury is not the loss of what he might have gained if the false facts had been true, but rather what he has actually lost by being deceived into the purchase. *Wool,* 818 F.2d at 1437 n. 2. Thus, the Plaintiff contends that he suffered the requisite injury when he purchased the artificially inflated stock and later sold it at a net loss.

The Defendants contend that the Plaintiff cannot show damages due to artificial inflation of the Matria stock, as the value of the stock was allegedly artificially inflated both at the time of the Plaintiff's purchase and at the subsequent time of sale. The Plaintiff bought 200 shares of Matria stock on December 5, 2001, and sold them on February 6, 2002. The Plaintiff alleges that the Defendants engaged in a pattern of material misrepresentations that inflated the price of Matria stock during the entirety of the Class Period from October 24, 2000, to June 25, 2002. Based on these allegations, the Defendants contend that the Plaintiff bought his stock at a price that was artificially inflated and later sold his stock at a price that was still artificially inflated. Accordingly, the Defendants conclude that any decline in the stock's price between the Plaintiff's purchase and sale could not be attributed to the concealment of facts by the Defendants, as these facts were allegedly not revealed as of the time of sale.

In support of this argument, the Defendants cite *Packer v. Yampol,* 630 F.Supp. 1237 (S.D.N.Y.1986). In that case, the plaintiff shareholders alleged that the value of the stock in a corporation was and remained artificially inflated by the continuing misrepresentations by the defendant directors of the corporation. *Id.* at 1240. The court held that the plaintiff shareholders lacked standing to sue, explaining that:

> Indeed, since plaintiffs allege that defendants' misrepresentations and omissions continue to date, it is logical to infer that any artificial inflation of the price of Graphic stock also continues. In that case, plaintiffs have not been damaged because they could sell their stock at an equally inflated price.

*Id.* Similarly, the Defendants contend that, according to the Plaintiff's own allegations, Matria's stock price was still artificially inflated at the time he sold; thus, they argue that he cannot allege damages by inflation and, absent injury, has no standing to sue. For the purpose of determining the Plaintiff's standing, *Packer* materially differs from the case at bar, as in that case, the plaintiffs suffered no loss; the value of the stock actually increased during the period that the plaintiffs held it. They sought not monetary damages but rather injunctive relief in the form of cor-

rective disclosures, which would have actually decreased the value of the stock. Thus, not only had the plaintiffs in *Packer* suffered no monetary injury, but any injury that they suffered would not be redressed, but rather exacerbated, by the relief that they requested. *Id.* at 1240–41 ("Moreover, even if plaintiffs did suffer some pecuniary loss for having to pay too much for their shares, the relief they seek is not logically related to remedying that loss."). In this case, the Plaintiff has suffered an out of pocket loss which gives him standing to sue.

### B. *False Statements or Omissions of Material Fact*

The Defendants contend that the Plaintiff has failed to plead fraud with sufficient particularity to satisfy the requirements of the Private Securities Litigation Reform Act [hereinafter "the Reform Act"]. Pursuant to the Reform Act, a plaintiff must "specify each statement alleged to have been misleading" and must outline "the reasons or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). If a plaintiff fails to meet this pleading requirement, the complaint must be dismissed. 15 U.S.C. § 78u–4(b)(3)(A); *see also Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 866 (5th Cir.2003); *Zeid v. Kimberley*, 11 Fed.Appx. 881, 882 (9th Cir.2001).

█ The policy underlying this provision of the Reform Act is to provide notice of the specific allegedly fraudulent conduct so that the defendant can directly rebut the charge rather than generally deny any wrongdoing. *In re Theragenics Corp. Securities Litigation*, 105 F.Supp.2d 1342, 1348–49 (N.D.Ga.2000). The Reform Act pleading requirements serve the additional purposes of protecting defendants from unfounded harm to their reputations, reducing the number of strike suits and "in terrorem" settlements, and preventing plaintiffs from suing and using discovery as a "fishing expedition" in blind hope of finding something to support their claims. *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 549 (8th Cir.1997); *Brooks v. Blue Cross & Blue Shield of Florida*, 116 F.3d 1364, 1371 (11th Cir.1997); *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 777 (7th Cir.1994); *In re Theragenics*, 105 F.Supp.2d at 1349. This heightened pleading requirement also permits the court at an early stage of the litigation to determine whether the false statements or omissions are material and whether they were made with the requisite fraudulent intent.

In this case, the Plaintiff has identified eleven statements or sets of statements which he contends are false or misleading. These alleged misrepresentations concern four areas of Matria activity: (1) the capabilities of the TRAX technology platform; (2) problems in the Roanoke Call Center and between the Call Center and TRAX; (3) the capabilities of Facet Technologies, especially as related to its ability to institute just-in-time inventory; and (4) GAAP violations concerning a loan to a former officer and a price increase by a drug supplier. The statements identified by the Plaintiff are as follows:

(1) An October 24, 2000, press release quoting Defendant Petit as stating that "[w]ith our new disease management technology platform, our TRAX ™ system, we are now able to provide disease management with an efficiency that no other company can offer." (First Am. Compl. ¶ 133).

(2) A November 2, 2000, Matria press release announcing an agreement with Medical Mutual of Ohio and stating that "Matria completed the development of TRAX ™, a new proprietary patient management and clinical record system, to support the Medical Mutual agreement as well as other disease management contracts" and that:

Our new system, TRAX, was designed by Matria specifically for disease management and allows case managers to identify at-risk health plan members with diabetes, cardiovascular disorders or an associated co-morbidity. Once identified, Matria case managers can utilize the system to manage clinical interventions. TRAX is a Web based process automation platform that connects patients, care coordinators, health plans and providers through a virtual private network. Individual plan members and entire health plan populations can be managed through the TRAX system.

*Id.* at ¶¶ 139–40.

(3) The December 14, 2000, Form 8–K that Matria filed with the SEC and accompanying slide presentation, outlining how Matria had "successfully launched TRAX(TM) platform for disease management." *Id.* at ¶¶ 142–45.

(4) A June 15, 2001, Form 8–K filed with the SEC stating that "TRAX (TM), our proprietary patient management and clinical record system, enables us to leverage our disease management programs with our telemedicine and fulfillment services" and offering the following detailed description of TRAX and its capabilities:

To support our disease management programs, we have developed the TRAX system. We believe the TRAX system provides Matria with a unique advantage in addressing the needs of the growing disease management market. Through a web-based open architecture, TRAX allows us to connect with patients, care coordinators, health plans and providers to facilitate the assessment of a patient using claims data, past medical history, laboratory, diagnostic and monitoring data and health risk assessments. TRAX™ allows our case managers to identify at-risk health plan members with diabetes, respiratory disorders or an associated co-morbidity, such as con-

gestive heart failure. TRAX is able to manage large populations and integrate large data sets across multiple disease states. Additional diseases and conditions can also be added to TRAX to manage co-morbidities associated with chronic diseases.

*Id.* at ¶¶ 152–53.

(5) An August 22, 2001, press release reporting Matria's 2002 outlook, in which Defendant Petit stated, "Our operations are currently functioning smoothly, and our sales initiatives are producing the desired results.... We are very fortunate to have the experience and technology to contribute to this emerging and effective healthcare discipline." *Id.* at ¶ 155.

(6) An August 30, 2001, prospectus filed by Matria in connection with an exchange offering of $122M of 11% Series B senior notes due 2008, echoing the statements in the June 15, 2001, Form 8–K listed above. *Id.* at ¶ 157.

(7) An October 24, 2001, press release announcing financial results for the third fiscal quarter of 2001 in which Defendant Petit stated,

We are pleased to report record revenues for the quarter, marking the third consecutive quarter of double digit revenue growth. Our revenue growth was again led by strong performances from all of our diabetes businesses. Population Health Management has grown in excess of 65 percent this year. This growth necessitated that we increase our call center capacity by over 50 percent during the quarter. Facet Technologies, our manufacturing operation, continued to broaden its consumer relationships and add new contracts. Consequently, we have increased their manufacturing capacity during the quarter.

*Id.* at ¶ 162.

(8) A January 27, 2002, interview excerpted from the Wall Street Transcripts,

in which Defendant Petit emphasized the importance of information technology integration and noted that "Matria Healthcare's competitive advantages are our technology and our management team. Relative to the technology area, our experience with healthcare information integration and connectivity technology gives Matria a decided advantage in responding to the needs of employers and health plans." *Id.* at ¶¶ 165–66.

(9) An April 26, 2002, conference call, in which Tom Robbins, then President of Health Enhancement, commented on the previous day's press release and noted that "[i]n Disease Management, getting the information quickly is critical. And our Disease Management Call Centers are able to get almost real-time information with regards to whether they're meant [for] healthplan members or testing regularly and according to the prescription of the physicians." *Id.* at ¶ 174.

(10) Defendant Petit's statement during the same April 26, 2002, conference call that Facet Technologies' major customers "are also getting very focused on just in time inventory, etc., etc., ... which we are." *Id.* at ¶ 176.

(11) Matria's six quarterly releases of its financial results issued between October 24, 2000, and February 19, 2002, which each failed to reflect a charge to earnings to establish a reserve against a loan to former President Robert F. Byrnes and, in doing so, materially overstated Matria's pre-tax earnings. *Id.* at ¶¶ 197–229.

■ As noted above, the Reform Act requires a plaintiff to identify the specific statements alleged to be misleading and to articulate the reason or reasons why each statement is misleading. The Plaintiff's First Amended Complaint satisfies the particularity requirements of the Reform Act. As set forth above, the Plaintiff has enumerated eleven statements or sets of statements that he alleges to have been misleading. In his First Amended Complaint, the Plaintiff also states the reasons why each statement is misleading. The Plaintiff alleges that Matria suffered significant problems with its information technology systems and infrastructure, rendering its comments lauding TRAX and the Roanoke Call Center misrepresentations of its then-current capabilities. (First Am. Compl. ¶¶ 50–118). The Plaintiff also alleges that Matria did not have Facet Technologies automated to comply with its customers' demand for just-in-time inventory, and that Matria had violated GAAP in failing to account for a loan to a former officer on its financial statements. *Id.* at ¶¶ 177, 197–203. In addition to alleging these affirmative misrepresentations, the Plaintiff contends that the Defendants failed to disclose a material development detrimental to its Women's Health segment-the substantial increase in price of a prescription drug called terbutaline sulfate which was supplied by Matria. *Id.* at ¶¶ 119–32. Thus, this Court concludes that the Plaintiff has satisfied the particularity requirements of the Reform Act for the above misrepresentations he attributes to the Defendants.

### C. *Loss Causation*

■ The Defendants contend that the First Amended Complaint fails to allege loss causation. To assert a claim under the Exchange Act, the plaintiff has the burden of showing that the misrepresentation made by the defendant "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4); *see also Robbins v. Koger Properties, Inc.,* 116 F.3d 1441, 1447 (11th Cir. 1997); *Bruschi v. Brown,* 876 F.2d 1526, 1528 (11th Cir.1989). To assert loss causation, a plaintiff must allege "that the untruth was in some reasonably direct, or proximate, way responsible for his loss." *Robbins,* 116 F.3d at 1447. As explained

by the Eleventh Circuit in *Robbins,* if the decision to invest is induced by misrepresentations or omissions that are material and were justifiably relied upon by the claimant, but are not the proximate cause of his monetary loss, recovery pursuant to Rule 10b–5 is not permitted. *Id.* A plaintiff need not show that the defendant's fraudulent act is the sole cause of the injury suffered, but he must show that the act was a significant contributing cause. *Id.* at 1447; *Bruschi,* 876 F.2d at 1531; *In re Premiere Technologies Inc. Sec. Litig.,* 2000 WL 33231639, at *11 (N.D.Ga.2000). The "plaintiff must show that the misrepresentation touches upon the reasons for the investment's decline in value." *Robbins,* 116 F.3d at 1447 (internal quotation marks omitted). Allegations of artificial price inflation alone do not satisfy this loss causation requirement. *Id.* at 1448.

The Plaintiff alleges that the Defendants made the complained-of misrepresentations between October 24, 2000, and June 25, 2002, and that the Defendants disclosed the truth regarding these misrepresentations in a June 25, 2002, press release. (First Am. Compl. ¶¶ 178–89). For this reason, the Plaintiff has sought to represent a class of Plaintiffs who purchased or otherwise acquired Matria securities between October 24, 2000, and June 25, 2002. The Plaintiff sold his Matria stock on February 6, 2002, four months prior to the disclosure of Matria's alleged misrepresentations. It is undisputed that the Plaintiff sold his stock in response to an adverse market reaction to the Defendants' January 30, 2002, press release. The First Amended Complaint states:

> On January 30, 2002, defendants issued a press release that preannounced fourth quarter 2001 earnings and that they would fall short of expectations, although revenues would exceed previous forecasts. Following this press release, the Company's stock declined 28% and Needham & Co., a securities indus-

try analyst, lowered it[s] rating on the stock to a "Buy" recommendation from a "Strong Buy" rating.

(First Am. Compl. ¶ 168). This is not, and cannot be construed as, an allegation that fraud or misrepresentation was revealed in the January press release. The Plaintiff's loss was due to the market's reaction to a forecast of lower fourth quarter 2001 earnings. Because this January press release "did not discuss the subject matter of the alleged fraud, as a matter of law, the decline in [the company's] trading price on that date cannot be considered a reaction to the disclosure of the alleged 'fraud.'" *In re Merrill Lynch Tyco Research Securities Litigation,* 2004 WL 305809, at *3–4 (S.D.N.Y. Feb.18, 2004) (citing *Robbins,* 116 F.3d at 1448–49). Thus, the Plaintiff fails to plead that the Defendants' alleged misrepresentations proximately caused or even "touched upon the reasons for" his loss, as these misrepresentations were not disclosed until well after the Plaintiff had sold his stock at the still artificially inflated price. As the Plaintiff fails to plead loss causation, dismissal of his Exchange Act claims against the Defendants is warranted. This is not a pleading issue; it is a failure to state a claim on the merits of the case.

### D. *Safe Harbor*

Two other defenses are worthy of discussion. The Defendants contend that their alleged misrepresentations are protected by the Reform Act's safe harbor from liability for certain "forward-looking statements." 15 U.S.C. § 78u–5(c)(1). Pursuant to this provision, a corporation or individual defendant may avoid liability for forward-looking statements that prove false if such statements are identified as forward looking, and are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those

in the forward-looking statement[s]...." 15 U.S.C. § 78u–5(c)(1)(A)(i). The Reform Act's definition of "forward-looking statements" includes statements of plans and objectives of management for future operations and statements estimating future economic performance. 15 U.S.C. § 78u–5(i)(1)(B) & (C). Perhaps more importantly, the Reform Act and subsequent case law recognize that assumptions about present conditions underlying statements of future plans or future performance are to be covered by the safe harbor. 15 U.S.C. § 78u–5(i)(1)(D). In *Harris v. Ivax Corp.*, 182 F.3d 799, 805–06 (11th Cir.1999), the Court of Appeals for the Eleventh Circuit recognized that barring mixed statements of fact and projection from the safe harbor would inhibit corporate officers from fully explaining corporate outlooks to shareholders or to the public. *Id.* at 806–07. Thus, statements of present or past observations regarding a company that are made in the context and furtherance of future projections may be protected by the safe harbor. *Id.* at 806 (recognizing that "[f]orward-looking conclusions often rest both on historical observations and assumptions about future events").

Seven of the statements identified by the Plaintiff as false or misleading are located in the Defendants' press releases and SEC filings.[1] These statements, though in isolation seemingly describing Matria's status quo operations, were made in the context of projections regarding future capabilities and earnings. For example, Defendant Petit's statement in the October 24 press release indicating that the call center capacity had grown in response to the growth of the Population Health Management practice—in isolation,

a statement regarding current or past Matria operations—was made in the context of his discussion of a broader impending paradigm shift toward reducing costs through preventative care and positive health outcomes. In addition, the statements are expressly identified in the press releases and filings as forward looking statements.[2] These are the types of mixed statements contemplated by the Court of Appeals in *Harris* and fall within the ambit of the safe harbor provided by the Reform Act.

The Court of Appeals also recognized, though, that treating such mixed statements as wholly forward-looking may create a loophole for misleading statements or omissions. To guard against abuse of this potential loophole, the Reform Act requires that any such statements either be accompanied by sufficient cautionary language or be made without actual knowledge of their falsity. Cautionary language accompanying a forward-looking statement must warn of "risks of a significance similar to that actually realized." *Harris*, 182 F.3d at 807. Such a warning would put an investor on notice of the risks associated with purchase of the security. *Id.* The seven statements located in Defendant Matria's press releases and SEC filings are accompanied by the requisite cautionary language. For example, the October 24, 2000, press release contains the following warning about the forward-looking statements made therein:

> Such statements include but are not limited to the Company's expectations for revenues, operating profits and earnings per share, the advantages to be attained from the Company's new disease man-

---

1. The seven statements discussed here are the statements numbered (1) through (7) in section B of this Order.

2. For example, Matria's press releases each contain the following language: "This press release contains forward-looking statements." (Defs.' Reply Mem. Supp. Mot. Dismiss, Ex. H).

agement software, and the effectiveness of the assistance of members of the Board of Directors in the Company's marketing efforts. Among the important factors that could cause actual results to differ materially from those indicated by such forward-looking statements include developments in the healthcare industry, third-party actions over which Matria does not have control, regulatory requirements applicable to Matria's business and the risk factors detailed from time to time in Matria's periodic reports and registration statements filed with The Securities and Exchange Commission. . . .

*See* Matria Announces Third Quarter Results (last visited Apr. 26, 2004) <http://www.matria.com/about/investor_relations/press/2000/index.cfm?pid=about_ir_pr_2000-10-24>. The registration statements cited in the press releases' disclaimers also contain cautionary language. For example, the Form 8–K filed with the SEC outlines risk factors associated with Matria securities and specifically cites risks stemming from TRAX and other information technology systems. (Defs.' Reply Mem. Supp. Mot. Dismiss, Ex. G). The filing notes that "[o]ur services are dependent on the effective use of information technology. Although we believe the TRAX (TM) system provides us with a competitive advantage in our industry, we are exposed to technology failure and obsolescence risk." *Id.* As the Defendants' alleged misrepresentations in the press releases and filings are accompanied by sufficient cautionary language, the Defendants are insulated from liability for such statements pursuant to the safe harbor provisions of the Reform Act.

E. *Scienter*

 Even if a statement is not forward-looking, there is no liability unless the plaintiff alleges "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). In the Eleventh Circuit, this means that, at the least, "a securities fraud plaintiff must plead scienter with particular facts that give rise to a strong inference that the defendant acted in a severely reckless manner." *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1287 (11th Cir.1999).

Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.* at 1282, n. 18 (quoting *McDonald v. Alan Bush Brokerage Co.,* 863 F.2d 809, 814 (11th Cir.1989)).

 The Plaintiff identifies three alleged misrepresentations which are not subject to safe harbor protection. The first is a statement by Defendant Petit in an interview excerpted from the Wall Street Transcripts. In this interview, Defendant Petit stressed the importance of information technology as a comparative advantage for Matria. He noted that: "Relative to the technology area, our experience with healthcare information integration and connectivity technology gives Matria a decided advantage in responding to the needs of employers and health plans." (First Am. Compl. ¶ 166). The Plaintiff identifies meetings and briefings that suggest that Defendant Petit and other officers of Defendant Matria were informed that the TRAX system faced intermittent functionality problems. None of these facts alleged by the Plaintiff, however, suggest that the above statement was false (e.g., that Matria did not have infor-

mation integration and technology experience) or that Defendant Petit knew the statement to be false when made, or that the statement was an extreme departure from the standards of ordinary care. Thus, pursuant to the Reform Act, no liability attaches for this alleged misrepresentation.

■ The second statement was made by Tom Robbins, then President of Health Management, in an April 26, 2002, conference call. The Plaintiff alleges that Robbins asserted Matria's competitive strength in technology, and noted that "[i]n Disease Management, getting the information quickly is critical. And our Disease Management Call Centers are able to get almost real-time information with regards to whether they're meant to healthplan members or testing regularly and according to the prescription of the physicians." (First Am. Compl. ¶ 174). The exact meaning of this statement is difficult to discern, but the Plaintiff contends that the statement is false or misleading insofar as it overstates the capabilities of Matria's call centers. This contention, however, is inconsistent with the Plaintiff's own assertions of fact. To illustrate the problems in Matria's call centers, the Plaintiff cites an August 28, 2001, report by The Ultimate Software Company that acknowledged inefficiencies at Matria's Roanoke Call Center. *Id.* at ¶ 78. The Plaintiff gives no indication, though, that these alleged inefficiencies existed at the time of the alleged misrepresentation on April 26, 2002. Indeed, as the Plaintiff notes, by February 2002, the Defendants had signed contracts for "new system solutions" for the Roanoke Call Center. *Id.* at ¶ 79. As the Plaintiff fails to sufficiently allege particular facts to suggest that Robbins' statement was false when made, much less to infer that Robbins was "severely reckless" in making the

statement, liability does not attach for this statement.

■ The third statement was made by Defendant Petit in the same April 26, 2002, conference call. Defendant Petit noted that Facet Technologies' major customers "are also getting very focused on just in time inventory, etc., etc., ... which we are." (First Am. Compl. ¶ 176). In his First Amended Complaint, the Plaintiff interprets this statement to mean that "customers of Facet were focused on just in time production and so is Matria." *Id.* The Plaintiff contends that Defendant Petit's statement was false because Matria "knew that it did not have Facet automated to comply with their customers['] demand for just in time production" and because "there were many discussions during the Class Period about automating the production process to support 'just-in-time' production." *Id.* at ¶ 177. These allegations, if true, do not demonstrate or even suggest that Matria was not focused on just-in-time inventory; rather, the "many discussions" cited by the Plaintiff suggest that even if Matria was not, as the Plaintiff alleges, just-in-time compliant, the company was focused on this type of production. As the Plaintiff fails to allege facts suggesting the falsity of the statement, much less Defendant Petit's knowledge of its alleged falsity, the statement is not actionable.

■ Finally, the Plaintiff alleges that the Defendants made misrepresentations in its quarterly releases of financial results by failing to reflect a charge against earnings to establish a reserve against a note to the company's former president. (First Am. Compl. ¶¶ 197–229). The securities laws regulate disclosure of information, not the management or mismanagement of a company. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 479, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). As the Supreme Court noted in *Santa Fe*, the

securities laws do not provide a remedy for acts "which constitute no more than internal corporate mismanagement." *Id.* Failure to establish adequate reserves is considered corporate mismanagement and, as such, is insufficient to establish securities fraud. *See, e.g., In re E.Spire Communications, Inc. Securities Litigation,* 127 F.Supp.2d 734, 748 (D.Md.2001). The same is true of the allegations concerning a proposed price increase by a supplier. The failure to follow Generally Accepted Accounting Principles alone does not constitute the basis for a securities fraud claim. *See, e.g., In re Comshare, Inc. Securities Litigation,* 183 F.3d 542, 553 (6th Cir.1999). Thus, as alleged, the Defendants' failure to establish bad debt reserves for the loan to Matria's former president does not state a federal securities claim, and dismissal of the claim is warranted.

## IV. *CONCLUSION*

For the reasons set forth above, the Defendants' Motion to Dismiss First Amended Class Action Complaint [Doc. 26] is GRANTED. Because the Court previously gave the Plaintiff the opportunity to amend his complaint in response to the Defendants' first Motion to Dismiss, and a motion to amend would be denied as untimely, the dismissal is with prejudice.